[No. A125474. First Dist., Div. Two. Jan. 17, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
JTH TAX, INC., et al., Defendants and Appellants.

1220

COUNSEL

Sheppard, Mullin, Richter & Hampton and Robert J. Stumpf, Jr., for Defendants and Appellants.

McDermott, Will & Emery and Peter J. Drobac for the International Franchise Association as Amicus Curiae on behalf of Defendants and Appellants.

Kamala D. Harris, Attorney General, Frances T. Grunder, Assistant Attorney General, and Sheldon H. Jaffe, Deputy Attorney General, for Plaintiff and Respondent.

The Sturdevant Law Firm, James C. Sturdevant and Monique Olivier for National Consumer Law Center and National Association of Consumer Advocate as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

LAMBDEN, J.—Defendant JTH Tax, Inc., doing business as Liberty Tax Service (Liberty), appeals from a judgment issued after a bench trial awarding plaintiff, the People, approximately $1,169,000 in civil penalties, ordering Liberty to pay approximately $135,000 in restitution, and permanently enjoining Liberty in several ways for violating state and federal lending, unfair competition, consumer protection, and false advertising laws. Liberty argues that the trial court made errors of law and/or fact in determining that a "handling fee" charged for certain bank products was an undisclosed finance charge under the federal Truth in Lending Act (15 U.S.C. § 1601 et seq.; TILA); Liberty's cross-collection practices regarding past loan debts owed by customers were improper; Liberty was vicariously liable for its franchisees' advertising; certain civil penalties for advertising violations should be paid by Liberty; and a permanent injunction regarding certain of Liberty's practices going forward was necessary and appropriate.

We disagree with each of Liberty's arguments. We find the trial court's analyses and findings to be thoughtful and well calibrated regarding the circumstances before it, and affirm the judgment.

## BACKGROUND

Liberty, a Delaware corporation with headquarters in Virginia Beach, Virginia, provides certain tax preparation and related loan services throughout the United States. As of the time of trial, Liberty had more than 2,000 franchised and company-owned stores throughout the United States, including 195 franchised stores in California (along with two company-owned stores in 2005 and 2006), all of which do business as "Liberty Tax Service." Liberty offered tax preparation services, efiling, "refund anticipation loans" (RAL) and "electronic refund checks" (ERC).

In February 2007, the Attorney General filed a complaint against Liberty in the Superior Court of the City and County of San Francisco alleging that Liberty had violated California's unfair competition law (UCL), Business and Professions Code section 17200 et seq., and California's false advertising law (FAL), Business and Professions Code section 17500 et seq.[1] The lawsuit claimed there were misleading or deceptive statements in print and television advertising by Liberty and its franchisees regarding Liberty's RAL's and ERC's and inadequate disclosures to customers in Liberty's RAL and ERC applications regarding debt collection, certain costs and interest on the extension of credit, the time it takes to receive money under refund options offered, and other matters. The remedies the People sought included injunctive relief, civil penalties, and an order of restitution.

### The Trial Court's Rulings

After a nine-day bench trial, the trial court issued a 49-page statement of decision. Many of the facts found by the court are not disputed. Liberty's RAL's were short-term loans provided by lender banks with which Liberty contracted. It was primarily Liberty, rather than the lender banks, that advertised and promoted the RAL's, offered them to customers, provided customers with multipage loan applications, filled out the applications, and obtained the customer's signatures. Liberty also delivered the RAL applications to the lender bank and distributed the loan proceeds to most of its customers.

If approved, an RAL was usually disbursed by the lender bank in one or two days, secured by a customer's anticipated tax refund and issued by a third-party bank. The loan amount was based on the anticipated refund minus all transaction-related charges and fees, including a finance charge and tax preparation fees, as well as a "handling fee" charged for the lender bank's establishment of a temporary, special purpose account into which the customer's tax refund was deposited directly by the Internal Revenue Service (IRS). The customer could not redirect a refund once the IRS was given notice of this special purpose account. The bank repaid its loan out of any tax refund subsequently deposited into the account by the IRS. The customer was responsible for repaying the full amount of the loan, regardless of the size of the actual tax refund deposited into the account.

An ERC application also authorized the lender bank to set up a temporary, special purpose account to receive the customer's tax refund directly from the IRS. When the IRS deposited the tax refund into the account, the bank

---

[1] Unless otherwise indicated, all subsequent references are to the Business and Professions Code.

deducted the tax return preparation fees, the handling fee, and any other applicable charges, and paid any remainder to the customer.

Liberty benefitted substantially from its sales of RAL's and ERC's. In 2007, it earned more than $11.6 million in revenue from their sales, 17.5 percent of its total revenues nationwide. RAL's and ERC's accounted for 22 percent of Liberty's California revenues in 2007, up from 8.28 percent in 2005. From 2002 to 2005, Liberty received 65 percent of the revenues on RAL's and ERC's issued to Liberty customers by First Bank of Delaware (FBOD). From 2006 to 2008, it received a flat amount for each RAL and ERC from Santa Barbara Bank & Trust (SBBT), then the exclusive supplier of these products in California.

Liberty also benefitted from sales of RAL's and ERC's because these products made its tax preparation services more affordable. Liberty had a high percentage of lower income customers and many of its customers could not afford to pay for tax preparation out of pocket. As Liberty's sale documents indicate, the key selling point for RAL's and ERC's was that the customer did not pay any costs up front. Liberty's chief financial officer testified, "Well, if we didn't offer bank products, customers—a lot of customers wouldn't come in our doors."

Liberty's loan programs were an important focus of its marketing efforts. As we will discuss, its advertisements and those of its franchisees featured promises of speedy cash in order to attract customers.

The court found against Liberty in three relevant areas. First, it concluded that the handling fee charged to ERC customers, typically $24 to $30.95 depending on the year, was an undisclosed finance charge in violation of the TILA (15 U.S.C. § 1601 et seq.), because an ERC was a form of credit that allowed customers to delay payment for tax preparation services. The court also found Liberty's failure to disclose this finance charge violated California's UCL and FAL. It ordered Liberty to pay $240,500 in civil penalties, disclose any fee incident to the extension of credit as a finance charge, and state the cost of such fees as an annual percentage rate.

Second, the trial court concluded that Liberty's employment of "cross-collection" practices in the course of selling RAL's and ERC's to collect applicants' tax refund loan debts from prior transactions, including non-Liberty transactions, was deceptive, unfair, and violated both federal and state laws. The court imposed $118,000 in civil penalties, ordered Liberty to pay $135,886 in restitution to affected customers, and permanently enjoined certain aspects of Liberty's practices.

Third, the trial court found Liberty liable for certain print and television advertisements that were "likely to deceive" within the meaning of California's UCL and FAL. These included advertisements created or approved by Liberty and those placed by California franchisees, the latter because, the court found, the franchisees acted as Liberty's agents in doing so. The trial court ordered Liberty to pay civil penalties of $753,199 for advertisements it created or approved and an additional $50,000 for advertisements by its franchisees.

The trial court also permanently enjoined Liberty from "disseminating or causing to be disseminated any [a]dvertisement that directly or indirectly represents [an RAL] as a client's actual refund," and from failing, in any advertisement that mentions refund loans, to state "conspicuously" that the product is a loan, as well as the name of, and fee or interest that will be charged by, the lending institution. Under the injunction, Liberty is required to monitor its employees and franchisees to ensure they refrain from engaging in false advertising, to warn, then fine, and then terminate those who commit violations, and to promptly notify the Attorney General's office of violations. The court maintained jurisdiction over the case and indicated that the parties could apply to it at any time for "such further orders and directions as may be necessary or appropriate for the construction or carrying out" of the court's judgment, "for modification or termination of any injunctive provision," and "for punishment of any violation" of the judgment.

Liberty filed a timely notice of appeal.

We have also reviewed and considered several additional filings in this appeal. We have reviewed and considered the amicus curiae brief filed by the International Franchise Association in support of Liberty, the amicus curiae brief filed by the National Consumer Law Center (NCLC) and National Association of Consumer Advocates (NACA) in support of the People, and the parties' filings in response to these briefs.

We have taken under submission Liberty's motion for judicial notice, filed on August 9, 2010. We hereby grant this motion pursuant to Evidence Code section 452, subdivision (c).

We have also taken under submission two motions to strike by the People. We discuss our rulings regarding the first, a motion to strike portions of Liberty's reply brief, in the discussion, *post*. Regarding the People's motion to strike portions of Liberty's response to the amicus curiae brief filed by the NCLC and NACA, the motion is denied. However, we conclude the arguments by Liberty that the People seek to strike are unpersuasive for the reasons stated in the People's motion, including because they are raised for

the first time in response to the amicus curiae brief, and/or because they are not particularly relevant in light of the rulings we make herein.

Finally, we have reviewed and considered the case law and arguments referred to in letters submitted to us by the parties.

## DISCUSSION

Liberty argues the trial court erred in ruling that Liberty's ERC handling fee was an undisclosed finance charge in violation of the TILA, that its cross-collection practices violated federal and state law, and that it was vicariously liable under agency law for its franchisees' deceptive advertising. Liberty also challenges the court's method of calculating certain of the civil penalties the court imposed for Liberty's advertising violations under the UCL and FAL. Finally, Liberty argues the trial court abused its discretion in ordering certain permanent injunctive relief. We now review each of these arguments.

### I.   *The ERC Handling Fee*

■■   Under the TILA and the related regulations, a finance charge is "the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction." (12 C.F.R. § 226.4(a) (2012); accord, 15 U.S.C. § 1605(a).) Liberty argues the trial court erred by concluding the ERC handling fee was a finance charge subject to the TILA because its customers pay it to a bank, not Liberty, for setting up a temporary refund account, and also pay the same fee in comparable cash transactions. We conclude the court did not err.

A.   *The Proceedings Below*

The court concluded the ERC handling fee was a finance charge because a Liberty customer must pay it "in order to defer payment for tax preparation fees" via purchase of an ERC, citing *Berryhill v. Rich Plan of Pensacola* (5th Cir. 1978) 578 F.2d 1092, 1099 (*Berryhill*). The court also found the handling fee was shared between Liberty and the relevant bank.

Liberty argued the handling fee was not a finance charge for three reasons, each of which the trial court rejected. First, Liberty relied on the fact that the fee was charged through the lender bank, not Liberty. The court concluded the details of how the charge was imposed were irrelevant, as was held in *Yazzie v. Ray Vicker's Special Cars, Inc.* (D.N.M. 1998) 12 F.Supp.2d 1230, 1232.

Second, Liberty argued the fee was charged in comparable cash transactions and, therefore, was not a finance charge. The court found only *four* out of 60,000 California customers who purchased ERC's between 2002 and 2007 paid up front for tax services. Relying on *Carney v. Worthmore Furniture, Inc.* (4th Cir. 1977) 561 F.2d 1100 (*Carney*), the court concluded these were " 'insignificant exceptions' to what is, for all practical purposes, a credit sale business" and, therefore, Liberty could not rely on the "comparable cash transaction" defense.[2]

Finally, Liberty argued the fee was not a finance charge because it was not "interest." The court concluded this was irrelevant.

## B. *Analysis*

### 1. *Payment to the Bank for Setting Up a Special Account*

Liberty first argues the trial court erred as a matter of law because the fee was paid to a bank for the costs of opening a temporary account and, therefore, was not a finance charge at all under the TILA, citing *Hahn v. Hank's Ambulance Service, Inc.* (11th Cir. 1986) 787 F.2d 543 (*Hahn*).

Liberty presents this issue as a question of statutory interpretation based on undisputed facts, which we review de novo. (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724 [122 Cal.Rptr.3d 331, 248 P.3d 1185] ["Statutory interpretation is a question of law that we review de novo."].) The *Hahn* court held an ambulance company's $5 charge to customers who did not pay for services when rendered was " '[a] small flat charge for the bookkeeping cost of processing delayed payment in no way geared to the amount of the bill,' " and, therefore, " 'simply does not implicate [the TILA].' " (*Hahn, supra,* 787 F.2d at p. 544.) Liberty argues its fee and the fee reviewed in *Hahn* are similar because both involve the administrative cost of processing a transaction.

Liberty's argument is unpersuasive because the $5 charge reviewed in *Hahn* did not grant a customer the *right* to defer payment of a debt. (*Hahn, supra,* 787 F.2d at p. 544.) To the contrary, it was assessed "in light of the customer's failure to pay the company at the time the service is performed, in accordance with customary policy," which the court found was more in the nature of a late payment that was exempt from the TILA. (*Hahn,* at p. 544.) In the present case, the handling fee was a condition to customers receiving Liberty's tax services on credit. Liberty does not establish why the fee's application to administrative aspects related to the extension of this credit matters, and we are not aware of any reason why it should.

---

[2] The court rejected other Liberty contentions not raised in this appeal.

Liberty also argues the fee was not a finance charge because it did not vary based on when Liberty[3] received payment for tax preparation services. It cites no legal authority for this proposition, however, and nothing in the TILA's definition of a finance charge provides support for this position. (12 C.F.R. § 226.4(a) (2012).) Therefore, this argument is unpersuasive as well.

In short, Liberty does not establish that the trial court erred in concluding that the ERC handling fee was a finance charge under the TILA.

### 2. *Liberty's "Comparable Cash Transactions" Argument*

Liberty next argues that, even if the ERC handling fee qualified as a finance charge under the TILA, it is also payable in a comparable cash transaction and, therefore, exempt from TILA regulation. (15 U.S.C. § 1605(a); 12 C.F.R. § 226.4(a) (2012).) The People argue the court correctly rejected this argument pursuant to *Carney, supra,* 561 F.2d 1100 because virtually all of Liberty's ERC business was credit sales. We agree with the People.

As Liberty points out, the purpose of the TILA "is to enable consumers to decide whether or from whom to obtain credit, and a charge that does not affect the cost . . . of credit relative . . . to cash is irrelevant to that purpose." (*Hoffman v. Grossinger Motor Corp.* (7th Cir. 2000) 218 F.3d 680, 681.) Thus, courts have repeatedly found credit fees are not finance charges when the same charge is applied in comparable cash transactions, as in the cases cited by Liberty. (See *Basile v. H & R Block, Inc.* (E.D.Pa. 1995) 897 F.Supp. 194, 198; *Alston v. Crown Auto, Inc.* (4th Cir. 2000) 224 F.3d 332, 334; *Hodges v. Koons Buick Pontiac GMC, Inc.* (E.D.Va. 2001) 180 F.Supp.2d 786, 793; *White v. Diamond Motors, Inc.* (M.D.La. 1997) 962 F.Supp. 867, 871.) However, none of these cases is persuasive in light of *Carney, supra,* 561 F.2d 1100 and *Berryhill, supra,* 578 F.2d 1092, because these two cases discuss circumstances that are most analogous to those in the present case.

In *Carney,* Worthmore sold Carney a food freezer in a consumer credit transaction. (*Carney, supra,* 561 F.2d at p. 1102.) As part of the transaction, Carney was required to purchase a freezer service policy costing $50, which was added to the sale price of the freezer and included in the amount financed, but not disclosed as part of the finance charge disclosed by Worthmore pursuant to the TILA. (*Carney,* at p. 1102.) The policy's cost was a fixed sum based on the type of appliance and not on the length of the credit repayment period. (*Ibid.*) At least 98 percent of Worthmore's appliance

---

[3] For simplicity's sake, we generally refer to "Liberty" when discussing conduct by Liberty or its franchisees, except in those portions of the opinion where we distinguish between the two.

business involved credit sales subject to the TILA, but Worthmore made cash sales of major appliances in which buyers were also required to purchase the freezer service policy. (*Carney*, at p. 1102.)

The appellate court affirmed the district court's conclusion that the cost of the freezer service policy should have been disclosed as part of the finance charge Worthmore disclosed pursuant to the TILA. The court rejected Worthmore's argument that the service policy was not "an incident to the extension of credit" as meant in title 15 United States Code section 1605 because identical charges were levied in each cash transaction. (*Carney, supra,* 561 F.2d at pp. 1102–1103.) The court found the alleged cash transactions were "insignificant exceptions to what is apparently a credit sales business" and, therefore, "the naked claim that the service policy charge is imposed on cash customers is insufficient to acquit it as not incident to the extension of credit." (*Id.* at p. 1103.) The court concluded the freezer service policy charge "was inextricably intertwined with Worthmore's interest as a creditor" and, therefore, was a finance charge under the TILA. (*Carney*, at p. 1103.)

Similarly, in *Berryhill*, Rich Plan sold frozen food in quantity to home consumers either on credit or for cash, but an "overwhelming proportion" of its sales was on credit. (*Berryhill, supra,* 578 F.2d at pp. 1094–1095.) To purchase food for six months on credit under a food plan contract, Rich Plan required the Berryhills to also enter into a food and freezer service agreement that entitled them to various benefits, including an additional three-year insurance plan for loss of food due to the freezer's mechanical breakdown or power failure, up to $300. (*Id.* at p. 1095.) The service agreement, which was the most profitable element of the transaction for Worthmore, was not disclosed as part of the finance charge on the food plan contract. (*Id.* at p. 1096.)

The district court found the failure to disclose the service plan as a finance charge violated the TILA. (*Berryhill, supra,* 578 F.2d at p. 1096.) On appeal, Rich Plan argued the service agreement was of a nature and sufficiently independent from the food plan contract so as not to be a charge imposed as " 'an incident to or as a condition for the extension of credit' " (*id.* at p. 1097) and, therefore, was not a part of the finance charge under the TILA. The appellate court disagreed because purchase of the service contract was a condition, and incidental to the extension of credit under the food plan contract. (*Berryhill*, at pp. 1097–1098.)

Rich Plan also argued that the service plan was not a finance charge because it was also required of cash customers. The *Berryhill* court rejected this argument based on *Carney, supra,* 561 F.2d at 1103, because the number of cash sales was "insignificant" and evidence indicated virtually all sales

were made on credit. (*Berryhill, supra,* 578 F.2d at p. 1099.) Rich Plan attempted to distinguish its transactions from those considered in *Carney* because its service agreement's payments and benefits extended for a period longer than the payments for the initial food order. The court failed to see the significance because "[t]he important question is whether the seller refuses to extend credit until the customer agrees to another charge. The details of the manner in which the charge is imposed are irrelevant." (*Berryhill,* at p. 1099.)

Similarly to *Carney* and *Berryhill,* there was substantial evidence to support the trial court's conclusion that the ERC handling fee was not charged in "comparable cash transactions" so as to remove it from regulation as a "finance charge" under the TILA. Liberty engaged in 60,125 ERC transactions with customers from 2002 to 2007. Only *four* customers paid in cash during this time. The trial court correctly concluded that these four cash transactions were "insignificant exceptions" to what was, for all practical purposes "a credit sale business." (See *Carney, supra,* 561 F.2d at p. 1103.)

Liberty also asks that we consider the evidence submitted below that there were 2,699 additional California customers during this same time period who "paid" their tax preparation fees via a Liberty coupon that enabled them to obtain these services at no cost, other than the ERC handling fee.[4] Liberty argues these customers did not seek an extension of credit from Liberty because they paid nothing for their tax preparation. This too is unpersuasive because these were not "comparable cash transactions"; indeed, they were not cash transactions at all. If anything, they resemble a credit transaction because the customer obtained tax preparation services without making any payment, provided that they paid the handling fee.

In any event, these coupon customers amounted to approximately four percent of Liberty's 60,125 ERC customers. Given this very small percentage and that these coupon transactions did not involve an exchange of cash, the trial court could reasonably conclude these coupon transactions were at most incidental exceptions to what amounted to a credit sales business.

In its reply brief, Liberty argues for the first time that it also engaged in comparable cash transactions with 46,222 RAL customers because, upon the bank's approval of these customers' RAL applications, Liberty was paid for tax preparation fees and the bank deducted its handling fee from the RAL given to the customer. Therefore, Liberty contends, a very sizeable amount of its business involved cash transactions.

---

[4] Liberty provides a citation to the record that indicates it introduced this evidence at trial, but does not provide a citation establishing that it used this evidence as part of a "comparable cash transaction" argument. The trial court's discussion of the issue in its statement of decision does not refer specifically to this evidence. Nonetheless, the People do not argue waiver. Therefore, we address its merits.

In their motion, the People, relying on *Westcon Construction Corp. v. County of Sacramento* (2007) 152 Cal.App.4th 183, 194–195 [61 Cal.Rptr.3d 89], argue that we should strike or disregard these portions of Liberty's reply brief as waived because Liberty's RAL contention is based on a new and unfounded factual theory that was not presented in the trial court below.

We agree with the People that we should disregard Liberty's tardy RAL argument for two reasons. First, Liberty's argument that the RAL's are "comparable cash transactions" is made for the first time in its reply brief. "Points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before. To withhold a point until the closing brief deprives the respondent of the opportunity to answer it or requires the effort and delay of an additional brief by permission." (*Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3 [67 Cal.Rptr.2d 350]; see *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [60 Cal.Rptr.2d 770] [" '[p]oints raised for the first time in a reply brief will ordinarily not be considered' "].) Liberty contends that it sufficiently preserves its argument in its opening brief by twice referring to its franchisees receiving payment for their services from the banks "up front," in one instance specifically referring to RAL's. This is hardly sufficient. Liberty did not argue RAL's were comparable cash transactions until its reply brief. Therefore, we disregard its RAL argument.

Furthermore, we agree with the People that Liberty has waived this appellate argument by failing to raise it first in the trial court below. (*Westcon Construction Corp. v. County of Sacramento, supra*, 152 Cal.App.4th at pp. 194–195.) Contrary to Liberty's assertion that it is merely presenting a new legal theory based on undisputed facts, there is evidence in the record indicating that Liberty was not paid its fee by the banks in RAL transactions until after tax preparation services were rendered, suggesting these transactions were more in the nature of credit sales. In other words, the argument rests on *disputed* facts.

In short, we conclude Liberty's "comparable cash transactions" argument lacks merit.

## II. *Liberty's Cross-collection Practices*

Liberty next argues the trial court erred in concluding Liberty's cross-collection practices violated the state Rosenthal Fair Debt Collection Practices Act (Civ. Code, § 1788 et seq.) and the federal Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.; collectively, FDCPA) and California's Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.; CLRA), requiring reversal on this issue. The People disagree, and also argue that we

should affirm based on the trial court's determinations that Liberty violated the "fraudulent" and "unfair" prongs of the UCL and, for certain of its cross-collection practices, the prohibition against deceptive advertising in the FAL. The People argue that Liberty does not challenge these determinations in its opening brief, thereby waiving any challenge to these dispositive rulings. We agree that Liberty has waived these claims and affirm on that basis.

## A. *The Proceedings Below*

In its statement of decision, the trial court detailed Liberty's contracts with FBOD and SBBT, the banks it primarily used in California for its loan products, which contracts obligated Liberty to assist FBOD and SBBT in collecting past RAL debts.

Regarding FBOD, which Liberty made its largest supplier of RAL and ERC products in California from 2002 to 2005, Liberty's "first job was 'bringing the consumer [to] the bank.' " The relevant RAL and ERC applications authorized collection of prior RAL debts. Liberty advertised the loans, solicited loan applications from customers in their offices, filled out the applications, and obtained customers' signatures on them. Once the applications were submitted, Liberty processed them through an automated underwriting system containing a cross-collection file compiled by Liberty on FBOD's behalf. This file listed customers who purportedly owed prior RAL debt, whether to FBOD or other banks. Liberty also assisted FBOD in mailing debt validation notices to RAL customers who were denied a loan because of owing a prior RAL debt. Pursuant to its contract with FBOD, Liberty received 65 percent of all debts collected from its California customers.

SBBT was Liberty's major supplier of RAL's and ERC's in California for a three-year period from 2006 through 2008. Liberty brought customers to SBBT by advertising the bank's RAL product in California. Liberty solicited loan applications from individual customers and obtained their signatures on RAL and ERC applications that authorized cross-collection. Liberty transmitted the applications to SBBT, which deducted any past RAL debts owed by the customers from their refund proceeds.

The court found that Liberty's RAL and ERC applications in California since 2002 included " 'authorizations' to collect any unpaid refund loan debts from past years out of the customer's refund proceeds," whether owed to Liberty or other RAL lenders, and, the court noted, whether the past debt was " 'stale' or otherwise uncollectible." The court concluded under both the "least sophisticated consumer" and "reasonable consumer" standards that

Liberty customers were "unlikely" to recall the details of such debts, particularly those "incurred far in the past and perhaps in connection with a loan issued by a different lender and/or obtained through a different tax preparer."

Importantly, the court found that neither Liberty nor the banks informed customers before "inducing them to 'authorize' cross-collection whether they [were] believed to owe a past debt or not." Thus, the trial court concluded, "before the customer has been given meaningful notice about the existence of a debt, the customer has lost control of the refund and, as a result, his or her right to effectively dispute the debt. . . . By seizing control of taxpayers' refunds before providing them any meaningful notice that they are believed to owe a debt, even a stale and possibly uncollectible debt, the collection scheme at issue is deceptive, unfair, and frustrates the fundamental purpose of the state and federal FDCPA."

The trial court further found that the applications Liberty used did not "clearly and effectively communicate the fact that the bank is acting as a debt collector and that any information obtained may be used for that purpose." Customers were not screened for a past debt until after they " 'authorized' " cross-collection, but the SBBT applications stated only that SBBT " '*may*' be acting as a debt collector." (Italics added.) The 2002 FBOD application did not contain statements required by the FDCPA. FBOD applications used from 2003 to 2005 did not clearly and effectively communicate the cross-collection authorization, which appeared on the second or third pages of lengthy and complex contracts that on their face had nothing to do with debt collection, making it unlikely that applicants would read and understand the significance of the information.

The court rejected Liberty's contention that applicants with prior RAL debt were unlikely to be deceived, citing "the fundamental problem with the scheme, which is that consumers are not told whether they owe a debt before being induced to irrevocably authorize cross-collection, even of stale debts they may not recall, and/or debts they may not legitimately owe." The court found Liberty had attempted to collect "an extant debt" through debt collection regarding 118 of its customers, all between 2002 and 2005.

The court concluded that Liberty's cross-collection practices violated several laws. First, "Liberty's and the banks' efforts to collect applicants' past debts were deceptive" pursuant to the FDCPA. Second, "[t]he scheme independently is 'fraudulent' and 'unfair' within the meaning of the UCL." Third, Liberty aided and abetted SBBT in violation of Civil Code section 1770, subdivision (a)(14) (part of California's CLRA), and by extension the UCL, by obtaining purported authorizations to pursue " 'stale' debts that ordinarily could not be recovered as a matter of law due to the passage of

time" without first disclosing the purported debt. Also, the applications did not satisfy the legal requirement that the debt "must be revived in writing, in the form of an express promise to pay or an unconditional acknowledgment of the indebtedness, signed by the debtor, and communicated to the creditor or his agent or representative." Fourth, Liberty's cross-collection practices regarding the collection of "stale" debts via SBBT's application were deceptive and, therefore, violated California's FAL.

The trial court ordered Liberty to pay $118,000 in civil penalties for its cross-collection practices pursuant to California's UCL and FAL, based on the number of debts actually collected, 118, and the doubling of the number of violations because the conduct involved violated both the UCL and FAL. The court found the violations to be serious, to have a serious impact on consumers, and to be persistent and long-standing. Accordingly, it set a base penalty of $500 for each violation.

Pursuant to its equitable powers and its powers under the UCL and FAL, the trial court also permanently enjoined Liberty from participating in, or facilitating, any program to collect past RAL debts that does not make appropriate disclosures to alleged debtors before they commit to any relevant authorization, as well as any program that attempts to obtain a customer's authorization to collect "stale" debts as part of offering RAL's or ERC's unless the customer revives the debt in the manner required by law.

B. *Analysis*

Liberty argues in its opening brief that the trial court erred in ruling that its cross-collection practices violated the FDCPA and the CLRA. In its opening brief, Liberty does not meaningfully challenge the court's rulings that Liberty's cross-collection practices violated the "fraudulent" and "unfair" prongs of California's UCL and FAL.

The People argue that Liberty has waived its appellate claim by failing to address the trial court's rulings that Liberty's cross-collection practices independently violated the UCL and FAL. The People further argue in their motion to strike portions of JTH's reply brief that we strike or disregard Liberty's substantive arguments in its reply brief about the trial court's UCL ruling.

We grant the People's motion on the ground that Liberty's reply brief arguments are tardily made without good reason for doing so being shown and, therefore, should be disregarded. (*Campos v. Anderson, supra,* 57 Cal.App.4th at p. 794, fn. 3; *Reichardt v. Hoffman, supra,* 52 Cal.App.4th at p. 764.) We affirm the court's ruling based on Liberty's waiver, given Liberty's failure to meaningfully address the court's UCL and FAL rulings in its opening brief.

California's UCL provides that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the FAL]." (§ 17200.) The UCL authorizes a court to order against any person who has engaged in unfair competition injunctive relief and civil penalties not to exceed $2,500 for each violation, which penalties may be cumulative of others. (§§ 17203–17206.)

■ The UCL's "scope is broad" and it governs " ' " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*).) Furthermore, its reference to " 'any unlawful, unfair *or* fraudulent' practice (italics added) makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. '. . . [S]ection 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' " (*Cel-Tech*, at p. 180.)

In its statement of decision, the trial court ruled that Liberty's cross-collection practices violated the FDCPA. However, the court also stated as independent bases for its rulings that Liberty's failure to sufficiently disclose its cross-collection practices to its customers violated the "fraudulent" and "unfair" provisions of the UCL. The court's findings supported these independent bases. It concluded Liberty's failure to disclose certain information about cross-collection was deceptive, including its failure to notify applicants before accepting their application that they had purported past RAL debts, including "stale" debts, to any lender participating in its cross-collection database that could be deducted from any tax refund deposited into the bank's special account. The trial court found that Liberty, by not giving meaningful notice to its customers before gaining control of their refunds, engaged in a scheme that was deceptive and unfair to a "reasonable consumer," the standard under which UCL claims are considered. (See, e.g., *Hill v. Roll Internat. Corp.* (2011) 195 Cal.App.4th 1295, 1304 [128 Cal.Rptr.3d 109].)

Similarly, the trial court found that certain aspects of Liberty's disclosures, or lack thereof, about cross-collection regarding the SBBT applications were "deceptive" and, therefore, violated California's FAL, which prohibits misleading or deceptive advertising. (§ 17500; see, e.g., *Sevidal v. Target Corp.* (2010) 189 Cal.App.4th 905, 923 [117 Cal.Rptr.3d 66].) The court's discussion of Liberty's practices regarding these applications supported this independent basis for finding Liberty liable.

Despite these independent bases for the trial court's rulings about Liberty's cross-collection practices, Liberty does not address them in its opening brief, other than to state that the court's "fraudulent" and "unfair" UCL rulings were "not correct." Instead, Liberty argues that the court erred by ruling it was liable under the FDCPA and CLRA.

As the People argue, Liberty's failure to address all bases for the court's ruling constitutes a waiver of its appellate claim. Liberty, as appellant, has the burden of persuasion; "[o]ne cannot simply say the court erred, and leave it up to the appellate court to figure out why." (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368 [50 Cal.Rptr.3d 398].) " '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].) When a trial court states multiple grounds for its ruling and appellant addresses only some of them, we need not address appellant's arguments because "one good reason is sufficient to sustain the order from which the appeal was taken." (*Sutter Health Uninsured Pricing Cases* (2009) 171 Cal.App.4th 495, 513 [89 Cal.Rptr.3d 615].)

In its reply brief, Liberty argues it did not need to address the "fraudulent" and "unfair" prongs of the UCL because the trial court "offered no elaboration beyond its extended discussion of the [FDCPA and CLRA] statutes. Liberty's 15-page discussion [in its opening brief] parallels the trial court's discussion and addresses each of specific reasons the court stated for its conclusions."

Liberty's argument is unpersuasive. It contends its conduct did not violate the FDCPA and the CLRA, but does not explain why this should bear on our consideration of whether its undisputed conduct also violated the "fraudulent" and "unfair" prongs of the UCL, or the prohibition against deceptive advertising in the FAL. These would be different claims of legal error under a different statutory framework. For example, as we have mentioned, these two prongs of the UCL do not require a finding of unlawful activity and are part of a broad statutory framework. Liberty's claims of legal error under the FDCPA and the CLRA do not address these other, independent legal bases for the court's ruling. It is not our role to speculate how they might apply.

Accordingly, we conclude that Liberty's failure to address the court's independent UCL and FAL bases for its rulings about Liberty's cross-collection practices is a waiver of any appellate claims regarding them, and affirm based on them. Given our conclusion, we do not need to, and do not, address Liberty's FDCPA and CLRA arguments.

### III. *Liberty's Liability for Franchisee Advertising*

Liberty next argues the trial court erred for three reasons in finding Liberty liable under agency theory for its California franchisees' misleading advertising, for which Liberty was required to pay $50,000 in civil penalties under the UCL and FAL and ordered to take remedial steps under the court's permanent injunction. According to Liberty, the franchisor-franchisee relationship requires a higher level of control than that considered by the court, Liberty was not liable under agency theory because it acted only to protect its trademark and goodwill, and it should be excepted from liability in any event because it was ignorant of the illegal advertising, did everything it could to stop it, and refused to accept its benefits. We conclude each of these arguments lack merit.

### A. *The Proceedings Below*

The trial court found Liberty liable under agency theory for its California franchisees' advertising that violated the UCL, FAL, and section 22253, subdivision (a). The court determined that under California law, a franchisee could be an agent of a franchisor, depending on the extent of the principal's *right* of control. "It is generally understood," the trial court wrote in its statement of decision, "that franchisors are often caught between the Scylla of failing to exercise sufficient control to protect their marks, and the Charybdis of exercising so much control they are vicariously liable for the torts of the franchisees or other licensees."

According to the trial court, at the core of the issue is the franchisor controls included in the statutory definition of the franchise relationship. Parties to a franchise agreement contract so that the franchisee markets its goods or services "under a marketing plan or system prescribed in substantial part by a franchisor" and, using this plan or system, substantially associates its business to the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol. (Corp. Code, § 31005, subd. (a)(1)–(3).) Thus, the court concluded, its inquiry "must focus on the extent to which the control reserved to the franchisor plainly exceeds that required to police the mark, which is control so pervasive that it amounts to complete or substantial control over the daily activities of the franchisee's business."

The trial court rejected Liberty's argument, based on *People v. Toomey* (1985) 157 Cal.App.3d 1, 14 [203 Cal.Rptr. 642] (*Toomey*), that "vicarious liability" is not available in an action for unfair business practices. The court closely examined the reasoning of *Toomey* and concluded that it did not stand for the proposition that principal-agency liability is unavailable for an unfair

business practices case, but merely disallowed only *"reverse* vicarious liability," meaning "officers and directors are not automatically (vicariously) liable for the acts of the company that employs them." Because this was not an issue in the present case, the court concluded *Toomey* did not bar its finding that Liberty was liable under agency theory.

In determining there was a principal-agency relationship between Liberty and its franchisees, the trial court focused on Liberty's operations manual, which, the People contended, showed Liberty had a right of control far in excess of what it needed to police its mark. The court found that, while many of the mandatory restrictions stated in the manual "appear[ed] designed to police [Liberty's] trademarks and the goodwill associated with those," a number of them went beyond this goal. Specifically, the court found, Liberty required franchisees to offer RAL's and ERC's via banks mandated by Liberty; prohibited franchisees from offering products and services without Liberty's permission; mandated franchisees' minimum operating hours, computers to be used, and day-to-day tasks such as how to open the store and when to clean the bathrooms; reserved the right to intervene in disputes with customers, including the right to pay refunds directly to customers and bill the franchisees for them; required franchisees to commit to maintaining Liberty's prescribed filing system and the setup for the tax return processing center; and controlled franchisee pricing by controlling the discounts franchisees could offer at different times of the year. The court concluded that "Liberty's right of control extends not only to the products and services franchisees may offer, but also to the manner and means by which its franchisees prepare tax returns, offer RAL's and ERC's, and interact with customers, and extends beyond that needed to protect its marks."

The court also emphasized what it found was Liberty's "particularly extensive" right of control over franchisee advertising, which Liberty used to not only protect its marks, "but also to dictate business strategy to franchisees." The court found Liberty controlled discounts in part because it thought "early season customers are not as price sensitive as late season customers" and controlled the products and services franchisees could advertise in part because "it believes that certain advertising is a waste of time and money." It found Liberty's operation manuals provided detailed advertising instructions, breaking the year into tiers, mandating extensive preapproval, setting out a "host" of marketing and advertising methods, and providing samples of copies. Thus, Liberty was "literally providing a detailed, step-by-step guide for every aspect of marketing and advertising." The provisions were expressed as imperatives and general rules.

Also, the court found, Liberty "retain[ed] an open-ended right to modify the operations manual without consent of the franchisees. This right of

essentially complete control over franchisee operations, and specifically advertising operations, exceed[ed] what Liberty reasonably need[ed] to protect its trademark and goodwill." The court concluded this was substantial evidence showing Liberty's franchisees were its agents, at the least for the purposes of advertising.

The trial court found that more than 100 illegal ads by Liberty franchisees ran in Pennysaver publications throughout California in 2007 and 2008. Specifically, it found that 43 ads falsely promised "most refunds in one day" or a variation on that theme, including four specifically approved by Liberty, and 67 ads violated section 22253.1, subdivision (a) by omitting the mandatory bank name and lender fee disclosures. It concluded that Liberty was liable as a principal for its agent-franchisees' illegal advertising.

B.  *Analysis*

1.  *The Franchisor-franchisee Relationship*

Liberty argues that the trial court erred in concluding that agency theory applied to its franchisor-franchisee relationships because the franchisor-franchisee relationship is "fundamentally different than the typical employer-employee relationship; and vicarious liability, developed as early common law to address ancient master-servant relationships, is a bad fit in the modern franchise context." It points out that franchisees are separate business entities that enter into arm's-length contracts with franchisors and (after noting that Liberty's California franchisees "operate as small business owners more than 3,000 miles from Liberty's Virginia headquarters") argues that some courts have declined to impose vicarious liability on one business entity for another's actions simply because they are in a commercial relationship with each other in recognition of "the realities of such remote business relationships."

Liberty also argues that "[c]ourts have recognized . . . that the right to control inherent in most aspects of a franchisor-franchisee relationship does not amount to 'actual control' for liability purposes." According to Liberty, courts have "narrowed the 'control' test in the franchisor context to require that a franchisor exercise *actual* control over the day-to-day operations of the franchisee, not merely have a right to control over 'uniformity and the standardization of products and services.' " (Italics added.)

Liberty relies primarily on case law from other jurisdictions for its argument, while largely ignoring the most significant in California. Liberty does quote the language in *Toomey*, addressed by the trial court, that being "[t]he concept of vicarious liability has no application to actions brought

under the unfair business practices act." (*Toomey, supra,* 157 Cal.App.3d at p. 14.) However, it does not rely on *Toomey* to argue that it is not subject to agency theory under California law.

Liberty also cites *Emery v. Visa Internat. Service Assn.* (2002) 95 Cal.App.4th 952 [116 Cal.Rptr.2d 25] (*Emery*) to argue that courts have declined to impose vicarious liability in the face of the realities of remote business relationships. *Emery* involved an action against certain Visa defendants by the plaintiff, acting as a private attorney general (*id.* at p. 955), for unfair business practices and deceptive advertising related to foreign lottery solicitations; the plaintiff sued while acknowledging Visa had nothing to do with the creation or mailing of the solicitations, which allowed payments by Visa bank cards. (*Id.* at p. 954.) The trial court granted summary judgment to Visa, rejecting, among other things, the plaintiff's theories that Visa's advertising, licensing of its logo, and utilization of its payment system created an actual or ostensible agency relationship with its merchants, or agency by ratification. (*Id.* at pp. 954, 959.)

In discussing the plaintiff's agency theories, the *Emery* court stated that it did not need to go further than to "remind plaintiff that his unfair practices claim under [the UCL] cannot be predicated on vicarious liability," quoting the language from *Toomey* that we have quoted herein. (*Emery, supra,* 95 Cal.App.4th at p. 960.) The appellate court also found the undisputed facts did not show any agreement or control by Visa that would establish an agency relationship. (*Id.* at pp. 960–961.)

Although the *Emery* court concluded that the plaintiff could not proceed on agency theories because vicarious liability is not available under California's unfair business practices law, Liberty does *not* rely on *Emery* for this proposition either.

Nonetheless, Liberty argues we should apply its strict construction of agency theory to franchise relationships to conclude that it "[did] not exercise the type of day-to-day operational control that would be consistent with cases imposing franchisor vicarious liability." It contends that its franchisees are solely responsible for training, hiring, firing, and supervising their employees, outfitting their offices with computer equipment, supplies and furniture, complying with all laws, and are free to operate as many offices as they choose. They can select among marketing methods, "are free to design their own advertising, subject to Liberty's approval, and select which publications to use," control "all of the discretionary elements outlined in the advertising and marketing sections" of the operations manual, and are free to decide how much they want to spend for marketing.

■ Liberty's legal and factual arguments are unpersuasive in light of the California law that it largely ignores. As the People argue and the trial court concluded, in California "[t]he general rule is where a franchise agreement gives the franchisor the right of complete or substantial control over the franchisee, an agency relationship exists. (2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 6, pp. 24–25.) '[I]t is the right to control the *means and manner* in which the result is achieved that is significant in determining whether a principal-agency relationship exists.' [Citation.] 'In the field of franchise agreements, the question of whether the franchisee is an independent contractor or an agent is ordinarily one of fact, depending on whether the franchisor exercises complete or substantial control over the franchisee.' " (*Cislaw v. Southland Corp.* (1992) 4 Cal.App.4th 1284, 1288 [6 Cal.Rptr.2d 386] (*Cislaw*); accord, *Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, 745 [69 Cal.Rptr.2d 640] (*Kaplan*).) " 'The significant test of an agency relationship is the principal's right to control the activities of the agent. [Citations.] It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent; the existence of the right establishes the relationship.' " (*McCollum v. Friendly Hills Travel Center* (1985) 172 Cal.App.3d 83, 91 [217 Cal.Rptr. 919].)

■ Also, as the People point out, our Supreme Court has held, without the limitations urged by Liberty in the present case, that "section 17500 [(the FAL)] incorporates the concept of principal-agent liability . . . ." (*Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 361 [185 Cal.Rptr. 453, 650 P.2d 328] (*Ford Dealers*).) Since violations of the UCL "include any . . . unfair, deceptive, untrue or misleading advertising and any act prohibited by [the FAL]" (§ 17200), *Ford Dealers* establishes that persons can be found liable for misleading advertising and unfair business practices under normal agency theory. To the extent that *Toomey, supra,* 157 Cal.App.3d 1, or *Emery, supra,* 95 Cal.App.4th 952 hold otherwise, which defendant implies without stating outright in the course of arguing its limiting theories, these cases are mistaken.

■ It is clear that, as the trial court recognized, we must be mindful that we are applying agency theory in the context of the franchisor-franchisee relationship. A franchisee, by definition, operates a business "under a marketing plan or system prescribed in substantial part by a franchisor," which operation "is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor . . . ." (Corp. Code, § 31005, subd. (a)(1), (2).) Accordingly, "the franchisor's interest in the reputation of its entire [marketing] system allows it to exercise certain controls over the enterprise without running the risk of transforming its independent contractor franchise into an agent." (*Cislaw, supra,* 4 Cal.App.4th at p. 1292, quoted in *Kaplan, supra,* 59

Cal.App.4th at p. 745.) Thus, a franchisor may exercise a right of control over such activities as advertising to protect its marks and goodwill.

However, it is equally clear that the franchisor's unique interests do not eliminate or alter the application of agency theory if the franchisor exercises a right of control that goes beyond its interests in its marks and goodwill. It is a question of fact as to whether, as the court considered in *Cislaw*, the franchisor retains " 'the right to control the *means and manner* in which the result is achieved' " and exercises " 'complete or substantial control over the franchisee.' " (*Cislaw, supra,* 4 Cal.App.4th at p. 1288.) This is precisely the standard applied by the trial court. Therefore, Liberty's argument that the court applied the wrong legal standard to determine that it was liable for its franchisees' misleading advertising lacks merit.

### 2. *Substantial Evidence of Liberty's Vicarious Liability*

Liberty next argues that, in any event, the trial court erred in finding it vicariously liable for its franchisees' illegal advertising under agency theory because it did not have a sufficient right of control over its franchisees' activities. We conclude substantial evidence supports the trial court's findings and, therefore, it did not err.

"Substantial evidence" is "evidence . . . *'of ponderable legal significance, . . . reasonable in nature, credible, and of solid value.'* " (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873 [197 Cal.Rptr. 925].) "When a . . . factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record,* there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . ." (*Id.* at pp. 873–874.) "Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of. a rule of law specifying the inference to be drawn. We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 [85 Cal.Rptr.2d 386].) "We may not reweigh the evidence . . . ." (*Ghilotti Construction Co. v. City of Richmond* (1996) 45 Cal.App.4th 897, 903 [53 Cal.Rptr.2d 389].)

The trial court included in its statement of decision findings regarding Liberty's overall control over franchisee operations and activities, including

via directions in Liberty's operations manuals regarding the offering of RAL's and ERC's, operating hours, equipment and office systems to be used, and day-to-day tasks, as well as Liberty's retention of the right to intervene in franchisee disputes with customers. The parties debate the purpose and nature of many of these controls.

We need not address all of the factual issues raised by the trial court and the parties regarding Liberty's control over franchisee activities in this particular circumstance. Even were we to conclude that, as Liberty argues, some aspects of its control over franchisee operations and activities were necessary to protect its marks and goodwill, there is substantial evidence, cited by the court in its statement of decision, that Liberty retained the right to control, and in fact did seek to control, its franchisees' advertising and other marketing activities beyond that necessary to protect its marks and goodwill.

Liberty "does not dispute that it attempts to exercise substantial control over its franchisees' advertising." It contends, however, that it does so in order to protect its goodwill, trademark and public image, and notes that, as we have indicated, as a franchisor, its interest in the reputation of its entire system allows it to exercise certain controls over the enterprise without running the risk of transforming its franchisees into its agents. (*Cislaw, supra*, 4 Cal.App.4th at p. 1292.) It further contends that its "sole objective is to 'police the mark,' i.e., to tailor an image for public consumption and promote consistency as a way of strengthening the franchisor's brand." Liberty points out that advertising by its nature uses the franchisor's trademark and "if not controlled, can destroy the franchisor's goodwill in its marks," and quotes from a treatise on franchises pointing out that " 'the franchisor has a vested interest in making sure that they are used properly so that . . . the franchisor's trademark rights are not impaired or the trademark displayed in a tasteless manner.' (Keating, Franchising Advisor (1987) pp. 39–40.)" Liberty also contends that each of the examples cited by the trial court and the People to support the court's agency finding was related to efforts to protect Liberty's trademarks and goodwill.

■ Liberty's arguments and contentions are unpersuasive under our substantial evidence standard of review. As we have noted, as the People point out, and as the trial court recognized in its statement of decision, " '[t]he significant test of an agency relationship is the principal's right to control the activities of the agent. [Citations.] It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent; the existence of the right establishes the relationship.' " (*McCollum v. Friendly Hills Travel Center, supra*, 172 Cal.App.3d at p. 91; see *Nichols v. Arthur Murray, Inc.* (1967) 248 Cal.App.2d 610, 613 [56 Cal.Rptr. 728] ["In

determining whether an agency relationship exists between parties to a business enterprise, which is the subject of an agreement between them, the right to control is an important factor."].) Whether or not some aspects of Liberty's controls of franchisee advertising were necessary or intended to provide protection of its trademarks and goodwill does not matter if Liberty's controls did not stop there. We conclude there is substantial evidence that they did not, but that Liberty instead retained the virtually unlimited right to control, and did extensively control, the manner and means of franchisee advertising. Furthermore, the trial court could reasonably conclude these extensive controls involved business strategy beyond that necessary to protect its marks or goodwill.

Specifically, as the court indicated, Liberty, through its operations manuals, provided step-by-step instructions, directions and limitations to its franchisees regarding their advertising, including instruction on what advertising would be appropriate for what temporal "tiers" of the year, in provisions that were expressed as imperatives and general rules. Each franchise owner was required to comply with the policies and procedures of the operations manuals. Furthermore, Liberty reserved the right to unilaterally modify its operations manual at any time, while breaches of the franchise agreement or the operations manual could result in a franchisee's termination. In other words, as the trial court also found, there was substantial evidence that Liberty "retain[ed] an open-ended right to modify the operations manual without consent of the franchisees. This right of essentially complete control over franchisee operations, and specifically advertising operations, exceed[ed] what Liberty reasonably need[ed] to protect its trademark and goodwill."

As the trial court further found, Liberty exercised control over the offering and marketing of products and services in a variety of ways. Evidence indicated that franchisees could not offer any products or services without first obtaining Liberty's written consent. Liberty controlled the pricing for products offered by franchisees, for example directing in its 2005 operations manual regarding price quotes: "During peak season you will give a quote of 80% of your targeted net fee rounded up to the nearest 9. (Example $112 would be rounded up to $119). After peak you will conduct a short interview over the phone and then give a quote based on the information you have obtained)."

Liberty also set standards for franchisees regarding the number of free returns to do each year. It controlled the discounts that franchisees could offer in coupons, depending on the time of the year, increasing the discount in March to bring in more customers and barring issue of free coupons redeemable after April 8th. As the trial court noted in its statement of decision, the record contains examples of Liberty instructing franchisees to change the discounts they planned to advertise.

As the trial court also found, Liberty required that any and all franchisee advertising had to be submitted to Liberty for approval prior to being used. There was substantial evidence that Liberty used these approval rights not only to protect its marks and goodwill, but also to control the business strategies and tactics of its franchisees. Along with instructions regarding the amount of discounts to offer, Liberty directed franchisees regarding what discounts could be offered at what time of the year. The court referred to a January 2006 e-mail, in which Liberty's Noreen Schuster wrote in response to a request for approval of an ad that "[n]one of these ads are approved, for various reasons," one of them being because they contained "[w]rong offer for early season." On another occasion, in February 2006, Schuster was asked to approve a flyer that advertised in English and Spanish that customers would receive $50 in cash when they brought their W-2 to Liberty and Liberty prepared their tax return. Schuster replied, "No this isn't approved. Cash in a Flash is used for really early season customers who haven't received their W-2s yet and the program should end this week. Hispanics should be brought in through the ITIN program."

The trial court further found that Liberty controlled all of the advertising and disclosures made by franchisees regarding RAL's and ERC's specifically. The court relied on an admission by Liberty that it required its franchisees during tax seasons for 2002 through 2005 to " 'conduct their business in full compliance with all agreements, guidelines and directives received from [Liberty], including, without limitation: guidelines and directives pertaining to . . . advertising, and disclosures; the franchisee's franchise agreement with [Liberty]; and the documents prepared and/or utilized by [FBOD] and [Liberty] in connection with the offering and sale of bank products.' "

Liberty contends that these controls were necessary to protect its trademarks and goodwill and to establish uniformity, and points to evidence here and there suggesting that some of its controls appeared to take these matters into consideration. However, its contentions ignore that the trial court could reasonably conclude from Liberty's very extensive right of, and actual, control over such things as pricing, advertising strategies and tactics, timing and amounts of discounts, and product offerings that Liberty controlled more than was necessary to protect its trademarks and goodwill. Liberty all but admits this in discussing Schuster's rejection of a franchisee ad in her January 2006 e-mail. It notes that Schuster also rejected the ad because it referred to an improper logo and then states, "[t]hus, *in addition to whether doing so was good for business*, Liberty rejected these ads as part of its efforts to protect the goodwill in its mark by implementing a uniform and consistent marketing plan." (Italics added.) In other words, Liberty acknowledges that it controlled matters at least in part because it was "good for business."

In short, Liberty's arguments and contentions ask that we reweigh the evidence to reach a different conclusion than the trial court, which we will not do under a substantial evidence standard of review. (*Ghilotti Construction Co. v. City of Richmond, supra*, 45 Cal.App.4th at p. 903.) We find no error in the court's conclusion that, "[e]ven if Liberty's franchisees are not its agents for all purposes, they are its agents at a minimum for purposes of advertising."

### 3.   *Liberty's Claim of an Exception Under* Ford Dealers

Liberty also argues that, even if its franchisees were its agents, it is not liable for their illegal advertisements under an "exception" to agency liability discussed by our Supreme Court in *Ford Dealers, supra*, 32 Cal.3d 347. We disagree.

In *Ford Dealers*, the California Supreme Court held that the Department of Motor Vehicles could penalize licensed automobile dealers for their employees' statements, noting that "courts have repeatedly held that licensees are responsible for the acts of their employees." (*Ford Dealers, supra*, 32 Cal.3d at p. 360.) The court stated, "The settled rule that licensees can be held liable for the acts of their employees comports with the general law governing principle-agent liability," and observed that "cases construing . . . section 17500 have consistently held business managements liable for the acts of their agents." (*Id.* at pp. 360–361.) However, after discussing related cases, it stated the following dictum in a footnote:

"[W]here a dealer is able to demonstrate unusual circumstances that negate the presumption of control, it might be unfair to hold that dealer liable for the misrepresentations of salespeople. Mere lack of knowledge would not suffice, where a dealer appeared to have tolerated misleading statements in the past or created a climate in which such misstatements were likely to occur. *However, a dealer might be able to defend against an action under [Vehicle Code] section 11713, subdivision (a) by demonstrating that it made every effort to discourage misrepresentations; had no knowledge of salespeople's misleading statements; and, when so informed, refused to accept the benefits of any sales based on misrepresentations and took action to prevent a reoccurrence.*" (*Ford Dealers, supra*, 32 Cal.3d at p. 361, fn. 8, italics added.)

Liberty argues it qualified for this "exception" because it made every effort to prevent misleading advertising by franchisees, had no knowledge of the Pennysaver ads placed by franchisees, and, once it learned of the ads, worked diligently to prevent a reoccurrence.

The People disagree. They correctly point out that the discussion in *Ford Dealers* indicates that whether such an "unusual circumstances" exception

exists is largely a question of fact for the trial court; furthermore, the suggested exception was not applied in the one subsequent appellate case that considered the criteria specified in *Ford Dealers*; *Rob-Mac, Inc. v. Department of Motor Vehicles* (1983) 148 Cal.App.3d 793, 799 [196 Cal.Rptr. 398] (concluding that it was not unfair to hold a dealer liable for acts of an independent contractor).

The People also disagree that the undisputed facts demonstrate that Liberty has met each of the three criteria discussed in *Ford Dealers*. To the contrary, the People point out that the trial court found it was "fair" to hold Liberty liable under the circumstances. They argue that this finding was not an abuse of discretion because it was supported by substantial evidence indicating that Liberty did not meet the first two *Ford Dealers* criteria, and that Liberty made no showing regarding the third.

We need only to review the first criterion to determine the matter. In its opening brief, Liberty contends that the undisputed facts show that it made "every effort" to discourage advertising misrepresentations. It cites its requirement that all advertising receive its written approval and the prohibitions stated in its 2008 operations manual against use in any advertising of the phrases "instant refund" or "refunds in 24 hours."

The People respond by citing to evidence that, regardless of these requirements and prohibitions, Liberty did *not* make every effort to prevent false advertising after it became aware of it. We agree. The evidence indicates that Liberty became aware in January 2006 that franchisees were running unapproved ads in the Pennysaver. It also became aware of unapproved ads in late 2006 and early 2007, at which time Schuster wrote in an e-mail that "Pennysaver is apparently doing this for 100 franchisees." Although Liberty knew about problems, such as when Schuster stated in a January 2007 e-mail that an unapproved ad had "several legal problems," it did not put a system in place to monitor ads being placed by franchisees, such as by checking Pennysaver online. According to Schuster, Liberty's discovery of unapproved ads was "sort [of] by happenstance."

Furthermore, the People cite to evidence that Liberty did not seriously attempt to work with Pennysaver until July 2008 to stop the unauthorized ads. This evidence indicates that in early 2007 Liberty's media director contacted a local representative of Pennysaver, who said national Pennysaver could do nothing about the matter; there is no evidence that Liberty did anything further. During this same time period, as the trial court found, dozens of ads began appearing in Pennysaver that improperly promised such things as "Most Refunds in One Day," "Get $1200 in Minutes . . . And the Rest of Your Tax Refund in 24 Hours," "Most Refunds in 24 Hours" and "Got W-2?

24 Hour Refunds." As the trial court also found, ads also appeared that did not provide the disclosures of the bank name and lender fees required by section 22253.1, subdivision (a). Nonetheless, the evidence indicates that Liberty did not contact a senior executive with Pennysaver and begin working out an agreement to try to prevent franchisees from running unapproved ads until late July 2008, six months after the Attorney General found the illegal ads and two months before trial.

In its reply brief, Liberty does not dispute this evidence. Instead, it points to other evidence that, it contends, demonstrates that it "made every effort—*in the sense of taking reasonable steps*—to prevent misleading advertising by franchisees." (Italics added.) "Reasonable steps" are not the same as "every effort." In any event, Liberty's argument amounts to a request that we reweigh the evidence, which we will not do under a substantial evidence standard of review. (*Ghilotti Construction Co. v. City of Richmond, supra*, 45 Cal.App.4th at p. 903.) We conclude its actions do not qualify under the possible exception discussed in *Ford Dealers*

## IV.  *The Court's Award of Civil Penalties*

The trial court imposed $774,399 in civil penalties pursuant to the UCL and FAL against Liberty for illegal advertising in six categories of ads. Liberty argues the trial court committed legal error by imposing these civil penalties based upon incompetent evidence. Once more, we disagree.

### A.  *The Relevant Law*

Section 17206, part of the UCL, provides that any person who has engaged in unfair competition is liable for a civil penalty not to exceed $2,500 for each violation, which may be assessed and recovered in a civil action brought by, among others, the Attorney General on behalf of the People of the State of California. (§ 17206, subd. (a).) Similarly, section 17536, part of the FAL, provides that any person who violates any provision of the FAL is also liable for a civil penalty not to exceed $2,500 for each violation, which also may be assessed and recovered in a civil action brought by, among others, the Attorney General on behalf of the People of the State of California. (§ 17536, subd. (a).) Sections 17206 and 17536 contain the following identical directives to the trial court regarding the assessment of these civil penalties:

"The court shall impose a civil penalty for each violation of this chapter. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness

of the misconduct, the number of violations, the persistence of the miscon-
duct, the length of time over which the misconduct occurred, the willfulness
of the defendant's misconduct, and the defendant's assets, liabilities, and net
worth." (§§ 17206, subd. (b), 17536, subd. (b).)

The penalties under the UCL and FAL are cumulative. (§§ 17205,
17534.5.) We review the trial court's imposition of these civil penalties under
an abuse of discretion standard. (*People ex rel. Bill Lockyer v. Fremont Life
Ins. Co.* (2002) 104 Cal.App.4th 508, 521–522 [128 Cal.Rptr.2d 463].) Under
this standard, "[w]e do not reweigh the evidence or substitute our notions of
fairness for the trial court's. [Citations.] 'To merit reversal, both an abuse of
discretion by the trial court must be "clear" and the demonstration of it on
appeal "strong" ' " (*Cho v. Seagate Technology Holdings, Inc.* (2009) 177
Cal.App.4th 734, 743 [99 Cal.Rptr.3d 436].) None of Liberty's arguments
establish an abuse of discretion.

The appropriate method of determining what constitutes a "violation"
under these civil penalties provisions was discussed at some length in
*People v. Superior Court (Olson)* (1979) 96 Cal.App.3d 181 [157 Cal.Rptr.
628] (*Olson*). The application of the resulting *Olson* standards to the present
case is extensively debated between Liberty and the People.

In *Olson*, a district attorney brought an action against a real estate firm and
others for disseminating false and deceptive newspaper advertisements in
violation of the UCL and FAL. The trial court granted summary judgment to
the defendants on the grounds that the civil penalty provisions violated the
defendants' commercial free speech rights and permitted the unconstitutional
imposition of excessive fines. (*Olson, supra*, 96 Cal.App.3d at p. 185.) The
People sought review of the court's rulings by extraordinary writ. (*Id.* at
p. 189.)

After determining that the UCL and FAL did not violate the defendants'
commercial free speech rights (*Olson, supra*, 96 Cal.App.3d at p. 195), the
appellate court addressed the validity and interpretation of the civil penalties
provisions, sections 17206 and 17536, regarding the "violation" issue. In
doing so, it rejected absolute arguments in favor of a case-by-case approach.

First, the *Olson* court rejected the People's argument that the number of
"violations" should be determined by the circulation of the newspaper in
which a false advertisement appeared. (*Olson, supra*, 96 Cal.App.3d at
p. 196.) The court noted that this theory would lead to a civil penalty in
excess of $2.5 billion for a false advertisement published in a single edition
of the heavily circulated Los Angeles Times. Relying on *People v. Superior
Court (Jayhill Corp.)* (1973) 9 Cal.3d 283 [107 Cal.Rptr. 192, 507 P.2d

1400], the court concluded it was unreasonable to assume that the Legislature contemplated penalties of that magnitude, which would violate "the due process prohibition against 'oppressive' or 'unreasonable' statutory penalties. [Citation.] Common sense tells us that every newspaper subscriber does not read all the advertisements published in the paper and could hardly be termed 'a person solicited' in the sense of one personally solicited by a door-to-door salesperson." (*Olson*, at pp. 197–198.)

However, the *Olson* court also rejected the view adopted by the trial court that dissemination of a false or deceptive advertisement through a single edition of a newspaper constituted a single violation of each statute as a matter of law. (*Olson, supra*, 96 Cal.App.3d at pp. 196, 198.) Instead, the *Olson* court instructed the trial court to follow a reasonable approach that took into account the particular circumstances of a case to determine what constituted a violation:

"We believe a reasonable interpretation of the statute in the context of a newspaper advertisement would be that a single publication constitutes a *minimum* of one violation with as many additional violations as there are persons who read the advertisement or who responded to the advertisement by purchasing the advertised product or service or by making inquiries concerning such product or service. Violations so calculated would be reasonably related to the gain or the opportunity for gain achieved by the dissemination of the untruthful or deceptive advertisement. While the method by which the number of violations may be proved is not before us, it would appear that it might well include expert testimony and circumstantial evidence. We do not see the difficulty of proof to be so onerous as to undermine the effectiveness of the civil monetary penalty as an enforcement tool." (*Olson, supra*, 96 Cal.App.3d at p. 198.)

The *Olson* court further held that under its interpretation, "the trial court must manifestly act reasonably in light of all pertinent factors including the kind of misrepresentations or deceptions, whether they were intentionally made or the result of negligence, the circulation of the newspaper, the nature and extent of the public injury, and the size and wealth of the advertising enterprise." (*Olson, supra*, 96 Cal.App.3d at p. 198.)

Similar to the *Olson* court, a number of other appellate courts have determined that what constitutes a "violation" " 'depends on the type of violation involved, the number of victims and the repetition of the conduct constituting the violation—in brief, the circumstances of the case.' " (*People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 129 [3 Cal.Rptr.3d 429], quoting *People v. Witzerman* (1972) 29 Cal.App.3d 169, 180 [105 Cal.Rptr. 284].)

According to Liberty, the court imposed excessive penalties for six categories of print and television advertisements beyond a single violation for each time the advertisement at issue ran, "even though the State did not meet its burden by proving additional violations, as required by [*Olson*]." Specifically, the trial court improperly imposed civil penalties "based on gross circulation figures for print publications (and Nielsen ratings for television shows) even though the State offered no evidence, expert or otherwise, of how many persons *actually saw* the advertisements at issue." We now review these arguments.

## B. *Television Advertisements*

Liberty argues that the trial court, while it acknowledged the *Olson* instructions, did not follow them when it imposed a $409,860 civil penalty "for an entirely truthful, non-deceptive television advertisement because the ad's disclaimer was not sufficiently conspicuous." The People presented the expert testimony of William Formeca, a media communications specialist with 30 years of experience in advising clients how to invest their advertising dollars. Liberty points to Formeca's testimony that Nielsen ratings, while they captured the number of adults who "saw" the ads at issue, did not take into account those who may not have been watching when the ads appeared because, for example, they momentarily left the room. Liberty then contends that "[i]n accord with *Olson*, not every viewer of a television program will listen to every commercial."

Liberty's contention, however, ignores key aspects of Formeca's testimony, which provided a reasonable basis for the court's calculation. As the People point out, Formeca testified about how many adults "saw" the illegal television ads based on Nielsen ratings. His testimony of net impressions was based on a counting of individual viewers only once, even if they saw the advertisement multiple times and lived in households with multiple persons. He testified that he counted "anybody who saw the commercial. If there were ten *people* in the household and two people saw it, then that would be included in the ratings estimate."

As the People further point out, Liberty also ignores the Nielson data indicating that viewers saw the deceptive television advertisements multiple times. There was evidence presented that, on an aggregated basis, each viewer saw the "Origami" ad an average of approximately 1.78 times; the "Stomp" ad an average of approximately 3.39 times; the "Catch" ad an average of approximately 1.78 times; and the Spanish language ad an average of approximately 2.72 times. However, the trial court did *not* impose penalties for such multiple viewings, further demonstrating the reasonableness of its calculations.

Liberty, rather than contend with this evidence, cites literature from the Journal of Advertising Research in support of its position that the court imposed penalties against it for advertisements that no one viewed. As the People urge, we must disregard this literature because it was never put before the trial court. (*Knapp v. City of Newport Beach* (1960) 186 Cal.App.2d 669, 679 [9 Cal.Rptr. 90] ["[s]tatements of alleged fact in the briefs on appeal which are not contained in the record and were never called to the attention of the trial court will be disregarded . . ."].)

Liberty's contention that we should consider this academic literature because courts "often rely on academic literature" is unpersuasive. Liberty cites only *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 107–108 [101 Cal.Rptr. 745, 496 P.2d 817], noting that the *Barquis* court considered academic literature from law reviews and a banking law journal. However, the *Barquis* court considered this literature only to discuss the "apparent prevalence" of a certain practice that abused the legal process and the courts' strong interest in preventing such abuse, did not indicate any party objected to the court's use of the literature, and did not rely on it to reverse any evidentiary ruling by a trial court. (*Ibid.*)

Liberty further contends that the civil penalties awarded regarding the "Stomp" and "Catch" television advertisements "are a particularly good example of how the use of gross viewership data led to an unreasonable and unfair conclusion." According to Liberty, the ads were entirely truthful and contained the required disclaimer, but, based on Nielsen data, the court awarded $409,860 in civil penalties. Liberty acknowledges that the disclaimer required a statement that the product was a loan, the name of the lender, and that a fee or interest applied. It nonetheless contends that the court committed legal error because the "only flaw" in these ads "was that the disclaimer was not 'conspicuous enough' even though the voice-over used the word 'loan' twice and the word 'loan' also appeared on the screen." (Fn. omitted.)

Liberty's argument is not about legal error, but about the facts, and ignores the substantial evidence to the contrary. As the People point out, the trial court concluded that the ads at issue were likely to deceive or confuse, thereby violating the UCL and FAL. The court found that the mandatory disclaimers contained in these advertisements "were in a very small font, appear within a mass of other text, and are on screen for just a second," and concluded they were "plainly designed to be overlooked by consumers" and "patently and deliberately illegible." Liberty does not explain why the court could not reasonably rely on this substantial evidence. Liberty's argument is unpersuasive in light of it.

Liberty also contends that the civil penalties of $170,364 awarded for one Spanish-language television ad were unfair because the ad did not contain the

word "refund," was not prepared or placed by Liberty, and was approved by mistake by its vice-president of marketing during the peak of tax season, when she received 400 e-mails a day, shortly after her husband had passed away. These are, of course, factual contentions, not arguments of legal error. As the People point out, Liberty again ignores the factual basis for the trial court's ruling, which was that the ad falsely promised most refunds (by referring to " 'reembolsos' ") in 24 hours, and that this was "a serious violation of a clear standard that Liberty was intimately familiar with." Liberty's contention is again unpersuasive in light of this evidence and the court's findings.

As the People also point out, the reasonableness of the court's calculation of civil penalties for the illegal television advertisements pursuant to *Olson* is further demonstrated by the fact that it imposed a significantly lower penalty than would have resulted if it applied the viewership estimates provided by the People. The evidence indicated that the television ads were aired a total of 1,829 times. Because penalties under the UCL and FAL are cumulative (§§ 17205, 17534.5), these would amount to at least 3,658 violations. Applying the maximum penalty of $2,500 per violation, the court could have imposed penalties of over $9 million, but only imposed penalties of $715,344 for these advertisements.

Finally, we also agree with the People that Liberty's arguments lead to an approach that would all but require individualized proof of viewership of an illegal commercial, which would be "so onerous as to undermine the effectiveness of the civil monetary penalty as an enforcement tool." (*Olson, supra,* 96 Cal.App.3d at p. 198.) This also would be contrary to the *Olson* standards. The *Olson* court referred to the possibility of proving damages via expert testimony, thereby suggesting that estimates of readership based on expert opinion—analogous to the viewership figures provided by Formeca in the present case—could be a reasonable and appropriate basis for determining the number of violations. (*Ibid.*) Liberty gives us no reason why the court could not reasonably rely on Formeca's testimony regarding Nielsen ratings and, based on our review of his testimony, we conclude that it could. On the other hand, Liberty does not suggest any reasonable way to determine such viewings under the circumstances, i.e., the electronic transmission of advertisements to television sets viewed by people in the privacy of their homes.

In short, Liberty fails to establish that the court committed any legal error or abuse of discretion in its imposition of civil penalties regarding Liberty's illegal television advertisements.

## C. *The Print Ads*

The court also imposed civil penalties under the UCL and FAL for certain illegal, Liberty-approved Pennysaver advertisements that were mailed to homes. Liberty argues the court's penalties for additional violations were improperly based on the circulation numbers for these advertisements, despite the admonition against doing so in *Olson*. Again, we disagree.

As the People point out, the trial court did not rely on the kind of gross circulation figures disfavored in *Olson*. Instead, the trial court stated that it was applying "a fraction of circulation as a proxy for readership." Accordingly, rather than multiply each violation by $1, it multiplied them by 0.0088 to determine the penalty to be assessed for Liberty-approved Pennysaver ads.

Furthermore, for Pennysaver advertisements by franchisees that Liberty did not approve, the court used a smaller multiplier of 0.0044 because of Liberty's indirect liability. When the initial figure of $968,000 resulted, the court reduced it to $50,000 because it considered the initial figure "grossly disproportionate to Liberty's role, [the] harm done to consumers, and the *in terrorem* goal of penalties."

As the People also point out, there was circumstantial evidence, a category of evidence that was referred to favorably in *Olson* (*Olson, supra,* 96 Cal.App.3d at p. 198), upon which the court could rely for its calculation. The ads were directly mailed to people's homes and Liberty's corporate marketing department and its franchisees considered Pennysaver to be a particularly effective outlet for reaching its target audience. Furthermore, many of the illegal advertisements appeared on the front cover of the mailed Pennysaver publications; common sense indicates this increased the likelihood that they would be read.

We also agree, again, with the People that Liberty's approach would all but require individualized proof that a person has read the advertisement, which would be "so onerous as to undermine the effectiveness of the civil monetary penalty as an enforcement tool." (*Olson, supra,* 96 Cal.App.3d at p. 198.)

In short, Liberty provides no explanation why the trial court's calculation that less than one percent of the publications circulated were viewed was unreasonable or improper in light of the circumstantial evidence. Its argument, therefore, is unpersuasive.

## V. *Injunctive Relief*

Finally, Liberty argues that the trial court abused its discretion for four different reasons in ordering permanent injunctive relief regarding Liberty's

and its franchisees' advertising because of Liberty's violations of the UCL and FAL, and urges this court to delete or substantially limit certain aspects of the injunction. We find no abuse of discretion.

A.  *The Proceedings Below*

The trial court issued an injunction in order to "address Liberty's failures not only to educate its own internal staff on the legalities of advertising, but its failure in controlling its franchises." The court stated it was concerned that "without an injunction, Liberty could easily and indeed unilaterally change its policies."

The trial court permanently enjoined Liberty from "[d]isseminating or causing to be disseminated any [a]dvertisement that directly or indirectly represents [an RAL] as a client's actual refund," and from failing, in any advertisement that mentions refund loans, to "state conspicuously that (1) the product being offered is a loan, (2) the name of the lending institution, and (3) a fee or interest will be charged by the lending institution." The court also required, among other things, that Liberty discipline its employees and franchisees who did not comply with policies and procedures that required Liberty to review all franchisee advertisements prior to their dissemination in California and ensure such advertisements complied with injunction's requirements.

Specifically, the court's injunction requires Liberty to discipline its employees by giving them a written warning of possible termination or other sanctions for their first violation of these requirements, suspending them without pay for three weeks for their second violation, and terminating their employment for a third violation. Similarly, the injunction requires Liberty to give franchisees a written warning of possible fines and termination for a first violation, order them to pay a $15,000 fine payable to the Attorney General for a second violation, and terminate them for a third.

Liberty is also required to audit at least 10 California franchisees each year to determine their compliance with Liberty's advertising approval policies and procedures and the court's order. During tax season, it is required to obtain on a monthly basis ads placed in Pennysavers in California (as well as any advertising outlet used in the last 12 months by a franchisee) and inspect on a biweekly basis Pennysaver's Web site to determine if ads about Liberty's services comply with the court's injunction. Liberty is further required to send an e-mail or other bulletin to California franchisees on a monthly basis during tax season reminding them of Liberty's advertising approval policies and procedures and the requirements of the court's order regarding advertisements.

B.  *Analysis*

■    Section 17203, part of the UCL, and section 17535, part of the FAL, authorize the court to enjoin persons who have engaged in unfair competition. They provide that "[t]he court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person" of practices which violate their respective chapters. (§§ 17203, 17535.) Liberty points out that this language limits the court's powers to that which is "necessary." This is correct, but Liberty ignores that "[t]he court's discretion is very broad" and that this language "is . . . a grant of broad equitable power." (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 180 [96 Cal.Rptr.2d 518, 999 P.2d 706] [regarding § 17203].) As this court has stated, "The remedial power granted under these sections is extraordinarily broad. Probably because false advertising and unfair business practices can take many forms, the Legislature has given the courts the power to fashion remedies to prevent their 'use or employment' in whatever context they may occur." (*Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy* (1992) 4 Cal.App.4th 963, 972 [6 Cal.Rptr.2d 193].) Accordingly, we review the court's injunction for abuse of discretion.

### 1.  *The "Discipline" Provisions of the Injunction*

Liberty first argues that the trial court abused its discretion because "the injunction goes well beyond what is necessary to take reasonable steps to prevent Liberty's franchisees from advertising in violation of the UCL and FAL." Liberty contends that the court now requires Liberty "to exert even more control over its franchisee advertising," and specifically challenges the necessity that Liberty require franchisees violating the rules regarding advertising a second time to pay a $15,000 fine to the Attorney General "regardless of the amount of time between violations, with no discretion, and no consideration of extenuating circumstances."

Liberty posits that a franchisee that inadvertently places an ad without a disclaimer during its first year of operation, is warned, and 15 years later places another ad that, due to the error of a new employee, does not contain a sufficiently conspicuous disclaimer would be required to pay this fine. Liberty contends that this example, although extreme, "illustrates . . . that without a more limited duration and a substantially more nuanced approach, the trial court's injunction is heavy-handed to the point of constituting an abuse of discretion." It makes this same argument regarding the court's requirements that it similarly discipline its employees, and that it notify the Attorney General in perpetuity within a week of its discovery of an advertising violation by a franchisee. Liberty cites only the general legal proposition that

injunctions should be limited to what is necessary in support of its argument that the court's requirements are so "heavy-handed" as to constitute an abuse of discretion.

In its reply brief, Liberty makes additional arguments why the court's order goes too far. These include that, while it may have a contractual right to terminate franchisees for illegal advertising, a point noted by the People, it does not have the contractual right to fine franchisees, that a $15,000 fine exceeds the $2,500 penalty that can be assessed for each violation of the UCL and FAL, and that the injunction's requirement that Liberty terminate a franchise for a third violation would cause a franchisee to lose its entire business.

We disagree with Liberty's arguments for three reasons.

First, as the People point out, the trial court found the illegal franchisee advertising was a "serious violation" and "persistent," that Liberty "did not devote sufficient resources to monitoring franchisee advertising," that Liberty "knew it had a problem with unapproved and illegal advertising in the Pennysaver in particular, but failed to take steps to stop it," and that Liberty then "took little or no correction action to prevent similar occurrences." The court further noted that regarding one illegal television advertisement, the company's chief marketing officer testified that she would still approve it for use in California; the court stated that "[t]his and other evidence demonstrates the need for injunctive relief" it ordered, and specifically the discipline requirements that Liberty complains of on appeal. The court concluded that its "injunction must address Liberty's failures not only to educate its own internal staff about the legalities of advertising, but its failure in controlling its franchisees." Liberty does not challenge the court's findings or conclusions, which are a reasonable basis for the court's requirement that Liberty discipline its employees and franchisees as ordered.

Second, Liberty emphasizes that the trial court's injunction is permanent and requires it to act in perpetuity. This ignores the fact that the court maintained jurisdiction over the case and indicated that the parties could apply to the court at any time for "such further orders and directions as may be necessary or appropriate for the construction or carrying out" of the court's judgment, "for modification or termination of any injunctive provision," and "for punishment of any violation" of the judgment. Thus, Liberty has the opportunity at any time to seek clarifications or modifications to the court's order, including in special circumstances, or to seek to end the court's injunction. This alleviates any reasonable concern about the court's "heavy-handedness."

Finally, as the defendant, Liberty has the burden to affirmatively establish that the court abused its discretion. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) The most fundamental principle of appellate review is that " '[a] judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Ibid.*) A number of Liberty's arguments are unsupported by citation to case law or legal authority beyond the most general, and Liberty ignores the substantial evidence supporting the trial court's concerns. It does not affirmatively establish error.

In short, we reject Liberty's argument that the trial court abused its discretion in ordering Liberty to discipline its employees and franchisees.

### 2. *Reasonable Notice*

Liberty next argues that the trial court abused its discretion because its injunction "does not provide reasonable notice about what conduct is prohibited." Again, we disagree.

As Liberty correctly points out, " '[a]n injunction must be narrowly drawn to give the party enjoined reasonable notice of what conduct is prohibited.' " (*Strategix, Ltd. v. Infocrossing West, Inc.* (2006) 142 Cal.App.4th 1068, 1074 [48 Cal.Rptr.3d 614].) It contends that the court's injunction does not do so because it requires that Liberty draw "legal conclusions about whether, for example, a franchisee's ad disclaimer is 'conspicuous.' "[5] This "example" is the only specific aspect of the injunction identified and, therefore, the only one we will address.

Once more, Liberty's summary argument, unsupported by any citation other than the most general legal authority, is unpersuasive. As the People point out, a federal case upholding an agency order requiring the use of "conspicuous" advertising disclaimers was favorably discussed by our Supreme Court in *Ford Dealers, supra*, 32 Cal.3d 347. The *Ford Dealers* court noted that in a similar case, *Bantam Books, Inc. v. F.T.C.* (2d Cir. 1960) 275 F.2d 680, 683, the Second Circuit upheld an agency order that a publisher print certain information " 'in clear, conspicuous type,' " in a position " 'adapted readily to attract the attention of a prospective purchaser' " because "a more specific order would not be feasible, since clarity

---

[5] Section 22253.1, subdivision (a), states, "Any tax preparer who advertises the availability of a refund anticipation loan shall not directly or indirectly represent the loan as a client's actual refund. Any advertisement that mentions a refund anticipation loan shall state *conspicuously* that it is a loan and that a fee or interest will be charged by the lending institution. The advertisement shall also disclose the name of the lending institution." (Italics added.)

and conspicuousness would vary with the size, color, placement and design of the publications." (*Ford Dealers*, at p. 368.) Our Supreme Court reached a similar conclusion in rejecting arguments that certain Department of Motor Vehicles regulations regarding advertising were impermissibly vague. (*Id.* at pp. 368–369.)

We agree with the trial court's approach in the present case based on this authority. It would not be feasible for the court to be more specific in light of the many different types of advertisements Liberty could disseminate. Liberty's "reasonable notice" argument is unpersuasive.

### 3. *Liberty's Due Process Argument*

Next, Liberty argues that the trial court "abused its discretion because its injunction requires Liberty to violate the due process of nonparties, i.e., its franchisees." This argument is also unpersuasive because Liberty provides virtually no legal analysis for us to consider.

Liberty cites the generic authorities that correctly indicate that "the state may deprive no man of liberty or property without due process of law." (*Endler v. Schutzbank* (1968) 68 Cal.2d 162, 165 [65 Cal.Rptr. 297, 436 P.2d 297]; see *Boddie v. Connecticut* (1971) 401 U.S. 371, 378–379 [28 L.Ed.2d 113, 91 S.Ct. 780] ["an individual [must] be given an opportunity for a hearing *before* he is deprived of any significant property interest"].)

Liberty also cites three cases with little, if any, explanation of their relevance to the circumstances of this case. (See *Bixby v. Pierno* (1971) 4 Cal.3d 130, 144–147 [93 Cal.Rptr. 234, 481 P.2d 242] [discussing whether the court's review of an administrative decision should be expanded when a vested constitutional right, such as the right to practice one's profession, is involved]; *Willner v. Committee on Character* (1963) 373 U.S. 96, 102–103 [10 L.Ed.2d 224, 83 S.Ct. 1175] [a bar committee's refusal to certify a person for admission to the bar without a hearing violated the person's procedural due process rights]; *Nebraska v. Goodseal* (1971) 186 Neb. 359, 367–368 [183 N.W.2d 258] [a state criminal statute that delegated to a person using self-defense the decision to set out what force was reasonable was unconstitutional since the Legislature set criminal laws].)

Liberty apparently is of the view that its due process argument is so obvious that it does not need to further explain it nor explain the relevance of the cases it cites. When an appellant asserts a point but fails to support it with reasoned argument and citations to relevant authority, we may treat the argument as waived and disregard it. (*People v. Stanley, supra,* 10 Cal.4th at p. 793.) We do so here. We also note, again, that the court has maintained

ongoing jurisdiction and that Liberty may seek the court's assistance in clarifying the injunction's terms at any time. Liberty fails to explain why this does not satisfy its due process rights.

### 4. *Likelihood of Harm*

Finally, Liberty argues that the trial court abused its discretion because there is no likelihood of harm, since the court has ordered Liberty to conduct itself in a manner that is consistent with Liberty's existing policy. Liberty, ignoring the court's numerous findings of its wrongdoing, goes so far as to state that "[t]here was thus no 'wrongful conduct' in the first place." Liberty's argument is utterly unpersuasive in light of the evidence of the case, which indicates that, regardless of Liberty's written policies, there was insufficient internal management of advertising practices and violations of law. Liberty fails to establish that the trial court abused its discretion by using its injunction to ensure that such violations of law do not occur going forward.

### DISPOSITION

The judgment is affirmed. The People are awarded costs on appeal.

Haerle, Acting P. J., and Richman, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 1, 2013, S208852.