Filed 4/26/22  P. v. Lambert CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088636 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F03123) |
| v. | |
| ELIJAH RAY LAMBERT, | |
| Defendant and Appellant. | |

In an attempt to recreate an Internet video, defendant Elijah Ray Lambert shot his best friend, Miguel Martinez, while Martinez wore a bulletproof vest.  The bullet clipped the vest and killed Martinez.  Tried for murder, defendant was found guilty of the lesser included offense of involuntary manslaughter, and a prior strike was found true.  He was sentenced to 12 years in state prison.

On appeal, defendant raises several alleged evidentiary errors, including that the trial court improperly admitted opinion testimony and hearsay statements, allowed leading questions on direct and redirect examination, and sustained objections to

1

questions during cross-examination. He argues the evidentiary errors, singularly and cumulatively, were prejudicial thereby requiring reversal. Defendant further contends he received ineffective assistance of counsel because his trial attorney inappropriately stipulated to an element of count two and failed to present mitigation evidence during sentencing, all while laboring under a conflict because a bar complaint was pending against him.

Finding no merit to defendant's contentions, we shall affirm his convictions. We shall remand the matter for resentencing in light of recent legislative changes affecting a trial court's sentencing discretion, and we shall vacate the presentence investigation and report fee originally imposed by the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with the murder of Martinez (Pen. Code, § 187, subd. (a), count one),[1] and possession of a firearm by a person under the age of 30 years who has been adjudged a ward of the court (§ 29820, count two). For count one, it was alleged that defendant used and personally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b), (c), & (d)). The following evidence was adduced during a jury trial.

On the evening of May 22, 2015, defendant and his then girlfriend, Hailey Dagsher, went to Bannister Park with two other friends, Osyrus Williams and Martinez.[2] Defendant and Martinez were roommates and best friends.

Williams brought a black .22-caliber revolver and a bulletproof vest to the park. The group had seen videos on the Internet of someone shooting another person wearing a bulletproof vest, and decided to recreate the video. Williams initially placed the vest on

---

[1] Further undesignated statutory references are to the Penal Code.

[2] Both Dagsher and Williams testified under grant of immunity after initially invoking their Fifth Amendment rights.

2

the ground and fired a test shot at it. They briefly inspected the vest and confirmed that it had worked as the bullet did not penetrate the vest but bounced off it.

Following the test fire, Martinez volunteered to put the vest on and said he wanted defendant to be the one to shoot at him. Defendant agreed and said he would try wearing the vest after Martinez wore it.

Martinez put the vest on, and Dagsher was told to record what happened. Dagsher jokingly asked Martinez, "Any last words?" Williams told defendant to shoot in the middle of the vest to ensure the bullet would hit only the vest and not Martinez. He pointed at Martinez's chest and said, "right here." Defendant fired a single shot at Martinez while standing approximately 15 feet away.

Martinez stumbled forward, fell into Williams's arms, and said he could not breathe. They removed the bullet proof vest and found a bullet hole under Martinez's collarbone; he died of a gunshot wound to the chest. The bullet had clipped the vest but had not gone through it. Dagsher tried to discard the video from her phone, but police were later able to recover the video of the shooting, which was played for the jury.

After realizing Martinez had been shot, the group started to panic. Defendant walked away and returned a short time later; he no longer had the gun. Dagsher and Williams said they should call 911, but defendant said they should lie and say that someone tried to rob them and Martinez got shot. He told Dagsher to get rid of the bulletproof vest.

Dagsher left the park and threw the vest in a dumpster at a nearby apartment complex. When she returned, she saw an officer and told him that someone needed help down the trail. While she initially lied to police about what happened, she eventually told them the truth and led them to the vest in the dumpster.

When deputies arrived, defendant told them that two Hispanic men wearing dark clothing had approached the group, demanded their stuff, shot Martinez in the chest, and then fled south along the dirt trail towards the river. Williams also lied to police about

3

the alleged robbery, going along with defendant's concocted story. He later told the officer the truth about what happened. Defendant, however, continued to maintain that Martinez had been shot during a robbery. After later learning that defendant's story was false, an officer returned to look for the discarded gun, but was unable to find it.

The jury found defendant not guilty of second degree murder, but guilty of the lesser included offense of involuntary manslaughter (§ 192, subd. (b)) and unlawful possession of a firearm (§ 29820). The jury further found that defendant used, and intentionally and personally discharged, a firearm thereby causing the death of Martinez, who was not an accomplice (§ 12022.53, subds. (b), (c) & (d)). In a subsequent proceeding, the trial court found true the prior strike allegation based on defendant's prior adjudication for robbery in December 2009.

After denying defendant's *Romero*[3] motion, the court sentenced defendant to an aggregate term of 12 years in state prison consisting of the upper term of four years for the involuntary manslaughter conviction, doubled to eight years for his strike prior, plus the midterm of four years for the firearm enhancement (§ 12022.5, subd. (a)). The court imposed the midterm on count two and stayed it under section 654. The court also imposed various fees and fines, including a $702 presentence report fee (former § 1203.1b). Defendant was deemed to have filed a timely notice of appeal.

## DISCUSSION

### I

### *Evidentiary Rulings*

Defendant challenges several of the court's evidentiary rulings during trial. We review a trial court's exercise of discretion in admitting or excluding evidence for abuse of discretion. The court's ruling will not be disturbed unless it exercised its discretion in

---

**3**     *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

4

an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Case* (2018) 5 Cal.5th 1, 46.) On appeal, we review the evidence in the light most favorable to the trial court's ruling. (*People v. Edwards* (2013) 57 Cal.4th 658, 711.)

### A.    *Testimony of Deputy Cater*

Defendant first challenges several portions of Deputy Andrew Cater's testimony. Deputy Cater responded to the scene and followed defendant and Williams back to where Martinez had fallen on the trail after being shot. After first eliciting that it was very dark and that there was poor visibility in the area, the prosecutor asked Deputy Cater to describe Martinez's skin color. Although the court overruled defense counsel's objection based on lack of foundation due to poor visibility, the prosecutor rephrased the question to ask Deputy Cater to describe Martinez's skin tone "as [he] saw it." Deputy Cater testified that, based on his observations, Martinez lacked a reddish color indicative of a person "profused with blood" and that his skin tone had "a gray or an ashen color to it."

The prosecutor next asked, based on his training and experience, whether Deputy Cater had seen dead bodies before and whether he could tell if Martinez had been dead for more than 10 minutes. The court sustained a lack of foundation objection to the latter question. The prosecutor then inquired as to how many dead bodies Deputy Cater had seen, and he estimated more than 100. He further described how he worked as an EMT for more than 16 years, working on ambulances and responding to 911 calls, and also served as a field medic in the military reserve. In doing so, Deputy Cater testified that he had seen people die in his presence and observed "the physical effects on their bod[ies], including skin tone, the temperature to the touch, and what happens to a person after they pass" on 20 to 30 occasions. Defense counsel did not object during this line of questioning.

The prosecutor next asked whether, based on this training and experience, Deputy Cater believed Martinez had passed more than 10 minutes before his arrival. The trial

court overruled defense counsel's lack of foundation objection, and Deputy Cater was permitted to testify that in his opinion, Martinez died more than 10 minutes before he arrived on scene.

Defendant argues the court improperly permitted Deputy Cater to speculate regarding Martinez's skin color and to offer a lay opinion regarding how long he had been deceased when Deputy Cater found him. The prosecutor, however, specifically asked Deputy Cater to describe Martinez's skin tone "as [he] saw it." Thus, Deputy Cater's description of Martinez as "ashen" was based on his firsthand observation rather than speculation as defendant argues.

To the extent defendant contends Deputy Cater gave improper lay opinion testimony, he did not object on that basis below. As the People note,[4] in the absence of a specific and timely objection in the trial court on the grounds sought to be urged on appeal, the claim has been forfeited. (Evid. Code, § 353 ["A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"]; *People v. Jones* (2012) 54 Cal.4th 1, 61 [defense counsel's failure to make specific objection during trial forfeits issue on appeal].)

**B.      Leading Questions**

Defendant next contends the trial court committed reversible error in allowing the prosecutor to ask three leading questions during Dagsher's direct and redirect examination, and one leading question while directly examining Deputy Jared Thompson, an officer who interviewed Williams the night of the incident. He contends that the

---

**4**      Defendant did not address the People's forfeiture argument in his reply brief.

6

leading questions were unduly suggestive and essentially sought to elicit specific answers from Dagsher that Williams had showed defendant where to shoot at the vest, that she had told the group it was a bad idea, and that she would not wear the bulletproof vest because it was dangerous, and from Deputy Thompson that Williams felt threatened by defendant to stick to the robbery story.

A "leading question" is one that proposes to the witness the answer that the examining party desires. (Evid. Code, § 764; *People v. Collins* (2010) 49 Cal.4th 175, 214 (*Collins*).) Questions calling for a "yes" or "no" answer are not leading unless they are unduly suggestive under the circumstances. (*Collins*, at p. 214.) While ordinarily leading questions may not be asked of a witness on direct or redirect, they may be justified where special circumstances in the interests of justice exist. The trial court has broad discretion in determining whether such special circumstances are present. (*Ibid.*)

1. *Dagsher Testimony*

With respect to Dagsher, the prosecutor played the video of the shooting and then asked her whether she heard Williams give warnings or instructions on where to shoot on the bulletproof vest. Dagsher responded that she could not remember. The prosecutor then asked again whether "[l]istening to the video did you see [Williams] giving directions on where to shoot on the vest?" The court overruled defendant's leading objection, and Dagsher responded, "Yes."

When next asked where Williams directed or gave a warning where to shoot, Dagsher said she "assumed" in the protected part of the vest, but later asked to see the video again when asked if she saw Williams pointing at a specific area. Without objection, the prosecutor then used the video to refresh Dagsher's memory. After watching the video, Dagsher testified that Williams had pointed to the center of Martinez's chest in directing defendant where to shoot the vest.

Leading questions are permitted on direct examination " 'to the extent necessary to stimulate or revive [the witness's] recollection.' " (*Collins, supra*, 49 Cal.4th at p. 215.)

7

Here, the record shows Dagsher had trouble recalling the precise details of the incident, including Williams's directions about shooting at the vest. Under such circumstances, the trial court did not abuse its discretion in permitting the prosecutor to use a leading question, that was not unduly suggestive, to refresh her memory. In any event, the jury saw the video firsthand and observed Williams's statements about where on the vest to shoot. Williams also testified that he told defendant to aim for the middle of the bulletproof vest. Thus, any alleged error in allowing a leading question was harmless as it is not reasonably probable the jury would have returned a more favorable verdict for defendant had the court sustained the leading objection. (*People v. Felix* (2019) 41 Cal.App.5th 177, 187 (*Felix*) [even if court abused its discretion in admitting evidence regarding a prior robbery involving the defendant and Jones, the error was harmless "because the jury received other evidence concerning [the] defendant's knowledge of Jones's violent nature"].)

Defendant also challenges two additional questions asked of Dagsher on redirect. We need not decide whether the questions were impermissibly leading, however, because the record shows Dagsher testified on a different occasion to the same subject matter. The jury thus heard the evidence without objection and defendant could not have been harmed by the court overruling his leading objections to two subsequent questions that covered the same issue. (Evid. Code, § 353, subd. (a) [objection to evidence must be specific and timely made]; *Felix, supra*, 41 Cal.5th at p. 187.) We provide additional portions of Dagsher's testimony for context.

The prosecutor asked Dagsher without objection, "Did anybody in your group at that point in time say we shouldn't be doing this?" Dagsher responded, "Uhm, I'm pretty sure I said this isn't a good idea, but it was kinda like we were all there and three against one, so shut up and go." Later on redirect, the prosecutor asked Dagsher whether, before defendant shot Martinez, she had "ever [said] this is a bad idea?" Defense counsel

8

objected to this question as leading, and after the court overruled the objection, Dagsher responded, "Yeah, before the shooting I did throw out there this is not a good idea."

Even if we assume, without deciding, that the objected-to question was leading, defendant suffered no prejudice as Dagsher had already testified that she thought it was a bad idea. Defense counsel, moreover, raised the topic with Dagsher during cross-examination, and it is also highly unlikely that the jury would have concluded otherwise since defendant's conduct was blatantly dangerous--he shot Martinez with a live weapon at close range in the dark while Martinez wore a bulletproof vest that did not cover vulnerable parts of his body, including his head and neck area.

Next, after Dagsher conceded on cross-examination that she did not think Martinez would get hurt, on further redirect the prosecutor asked Dagsher if she wanted to put the vest on. She responded, "No," because "[i]t's not exactly the brightest thing to do." When the prosecutor asked, "Why not," she explained, "Because who's to say he's gonna aim correctly, or be wearing the vest correctly, or anything like that. There's so many things that could have gone wrong." Without objection, the prosecutor followed up with, "And that's why you wouldn't wear the vest, right?" Dagsher responded, "Correct." The prosecutor then asked, "That's why you thought it was dangerous?" After the court overruled defendant's leading objection, Dagsher responded, "Yes."

By the time counsel objected to the question whether she thought it was dangerous, Dagsher had already testified without objection that she said it was a bad idea before the shooting, and that she did not want to put the vest on because it was not the brightest thing to do since numerous things could have easily gone wrong thereby putting someone's life at risk. Thus, Dagsher had already testified why she believed the stunt was dangerous and did not want to partake in it, and defendant could not have been prejudiced by the prosecutor's redundant question whether she thought it was dangerous. We also note that the jury heard similar testimony without objection from Williams.

9

### 2. *Deputy Thompson Testimony*

Defendant contends the court erred in allowing the prosecutor to ask Deputy Thompson on direct if "Williams [told him] whether or not [defendant] had threatened him?" After defendant's leading objection was overruled, Deputy Thompson responded that Williams did not "specifically say about specific threats, but he did specify that he was afraid of [defendant] and that he wanted to be out of the area so he could talk to me further about the incident." Even if we assume, without deciding, that the question was unduly suggestive, it did not garner the desired response and was not prejudicial. That is, Deputy Thompson did not testify that Williams told him defendant had in fact threatened him. Williams himself testified on direct that defendant had not threatened him, but that his statement to Deputy Thompson meant that he did not want to remain in the area with defendant and the other officers because he did not want to be near the area where Martinez had died as he was distraught. Any alleged error in allowing the question, even if leading, was harmless.

### C. **Hearsay Statements**

Defendant contends the court erred in allowing the prosecutor to elicit two hearsay statements from Sergeant Dennis Prizmich about what Williams had told him the night of the incident.

First, the prosecutor asked Sergeant Prizmich whether Williams had described defendant's reaction, if any, to being told to call the police right after shooting Martinez. The prosecutor argued the question was for purposes of impeachment, and, after overruling defendant's hearsay objection, Sergeant Prizmich testified that Williams said defendant was "freaked out and scared that he might be arrested for a murder charge."

Second, the prosecutor asked whether Williams told the sergeant that he could no longer see defendant after defendant went down the trail towards the river after shooting Martinez. Over defendant's hearsay objections, Sergeant Prizmich testified that Williams

10

said that he could not see defendant for a short period of time after defendant walked down the trail following the shooting.

"Hearsay may be briefly understood as an out-of-court statement offered for the truth of its content." (*People v. Sanchez* (2016) 63 Cal.4th 665, 674; see also Evid. Code, § 1200, subd. (a) [hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated"].)  Hearsay is generally inadmissible unless an exception applies.  (Evid. Code, § 1200, subd. (b).)

We need not decide whether Sergeant Prizmich's responses constituted proper impeachment of Williams with a prior inconsistent statement as the People argue,[5] because Sergeant Prizmich's testimony was cumulative of other properly admitted evidence, and, thus, any error in permitting the challenged testimony was harmless. (*Felix, supra*, 41 Cal.App.5th at p. 187.)  On direct, Williams testified that he saw defendant walk away from where they were standing immediately after the shooting and that because it was dark, he could not see where defendant went.  And, similar to Sergeant Prizmich's "freak[ing] out" statement, Williams testified that everyone, which necessarily includes defendant, was in a "panic" after Martinez fell into his arms after being shot.  Given this properly admitted evidence, we are convinced any purported error in allowing Sergeant Prizmich to answer the two challenged questions was not prejudicial.

---

**5**    "[U]nder Evidence Code sections 1235 and 770, a hearsay statement of a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement." (*People v. Cowan* (2010) 50 Cal.4th 401, 502.)  "A statement is inconsistent for this purpose if it has ' "a tendency to contradict or disprove the [witness's trial] testimony or any inference to be deduced from it." ' " (*Ibid.*)

11

### D. Sustained Objections During Cross-examination

Defendant contends the court improperly sustained objections to the following two questions on speculative and vagueness grounds, respectively, during defense counsel's questioning of Williams: (1) "Okay. And was that a factor in going forward with someone putting on the vest, the fact that you successfully shot at it and it didn't penetrate?" and (2) "Right. But before, the planning and participation of this was in part your idea wasn't it?" He argues that sustaining the objections prevented him from fully cross-examining Williams on his thoughts in assessing whether to go forward in testing the vest out by having someone wear it and in partly planning and participating in the stunt that ultimately killed Martinez.

Even if we disregard defendant's failure to support his argument with citations to any supporting authority in his opening brief (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [appellate court need not consider points made without citation of authorities]), sustaining the objections, even if error, did not rise to the level of an unconstitutional deprivation of the right to cross-examine or present a defense. "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)

Defendant, moreover, was able to elicit the same evidence from Williams during other questioning. (*People v. Fudge, supra*, 7 Cal.4th at p. 1103 [any error in sustaining hearsay objection harmless where other testimony elicited same evidence].) Williams testified without objection that he had seen videos of someone being shot while wearing a bulletproof vest, and that his intention in going to the park that night was to do something similar. He conceded he tested the vest by first shooting at it on the ground before anyone put it on to make sure that it worked, and that the next step in the plan was to shoot someone wearing the vest once they determined the vest stopped the first bullet. Williams also testified without objection that he did not instruct defendant not to shoot at

12

the vest while Martinez wore it, and instead was showing him where to shoot the vest, that he went along with the shooting, and that he participated in the shooting plan. Thus, defendant was able to elicit Williams's thoughts on planning and participating in the shooting stunt that led to Martinez's death during cross-examination, and any alleged error in sustaining the objections was harmless.

### E.    Cumulative Error

Defendant contends that even if no single evidentiary error compels reversal, the alleged errors cumulatively rendered the trial unfair, requiring reversal.

In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial. (*People v. Cain* (1995) 10 Cal.4th 1, 82.) While a few isolated instances of error in defendant's trial may have occurred, we do not believe they affected its fairness either individually or taken together. "Defendant was entitled to a fair trial, not a perfect one." (*Ibid.*)

The evidence overwhelmingly supports the jury's involuntary manslaughter conviction. The evidence showed that defendant shot Martinez from 15 feet away and missed the bulletproof vest in an attempt to recreate a dangerous Internet video. The bulletproof vest left significant portions of Martinez's body, including his head and neck, exposed. Defendant did so while in the dark with limited visibility. The shooting was captured on video and played for the jury. Under the circumstances, it is not reasonably probable that the jury would have reached a more favorable result in the absence of the alleged evidentiary errors. (*People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### II

### *Ineffective Assistance of Counsel*

Defendant contends his counsel was constitutionally ineffective in two respects: (1) by stipulating that he had been adjudged a ward of the juvenile court for a 2009 robbery, which was an element of count two, possession of a firearm by a person under

the age of 30 years who has been adjudged a ward of the court (§ 29820); and (2) by failing to introduce mitigation evidence concerning mental health disorders that were referenced in letters from family and friends and submitted to the court prior to sentencing.**6**

To establish ineffective assistance of counsel, defendant must show that his counsel's representation fell below the standard of a competent advocate and a reasonable probability exists that, but for counsel's errors, the result would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)  A " 'reasonable probability' " is a probability sufficient to undermine confidence in the outcome.  (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) "The likelihood of a different result must be substantial, not just conceivable." (*Harrington v. Richter* (2011) 562 U.S. 86, 112.)  Surmounting *Strickland*'s high bar is thus never an easy task. (*Harrington,* at p. 105 [*Strickland*'s high bar must be applied with scrupulous care since ineffective assistance claims can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial].)  A claim for ineffective assistance of counsel will be sustained "only if the record on appeal

---

**6**     In his reply brief, defendant claims for the first time that his trial counsel was laboring under a conflict of interest because he was facing disciplinary action from the State Bar.  We will not consider points raised in the reply brief for the first time. (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1232.)  Furthermore, in so arguing, defendant makes numerous factual assertions without any citation to the record.  We may disregard such contentions as outside the record and unsupported by proper page citations to the record on appeal. (*People v. Jenkins* (2000) 22 Cal.4th 900, 952 [review on direct appeal is limited to the appellate record]; *Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 970; *Truong v. Nguyen* (2007) 156 Cal.App.4th 865, 882 [documents and facts that were not presented to the trial court and which are not part of the record on appeal cannot be considered on appeal]; Cal. Rules of Court, rule 8.204(a)(1)(C).)  We do not address this claim further.

affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.)

## A. *Stipulation*

Defendant was charged in count two with possession of a firearm by a person under the age of 30 years who has been adjudged a ward of the court (§ 29820). During trial, counsel agreed to stipulate that defendant was adjudged a ward of the court for violating section 211, robbery. The court then explained to defendant that this was an element of the offense that the prosecutor had to prove beyond a reasonable doubt, and questioned defendant whether he wanted to waive his right to a jury trial on that specific issue. Defendant responded, "Yes," and joined in the stipulation. The following stipulation was subsequently read to the jury: "The parties hereby stipulate to the following facts: [defendant] was born on July 7th, 1993, and on December 1st, 2009, was adjudged a ward of the court for a violation of Penal Code Section 211 in the Juvenile Court of Sacramento County."

Defendant argues counsel should have sought to bifurcate the possession offense from the murder charge or require the prosecutor to prove all elements of the possession offense rather than stipulate to the wardship element. Failure to do so, in his view, demonstrates incompetence. We are not persuaded.

Defense counsel could have reasonably determined that a motion to sever or bifurcate the possession offense was unlikely to be granted since the offenses arose out of the same facts and occurred simultaneously. (§ 954 [an accusatory pleading may charge two or more different offenses connected together in their commission]; *People v. Soper* (2009) 45 Cal.4th 759, 771-772 [the law prefers consolidation or joinder of offenses for trial because it ordinarily promotes efficiency].) And, tactically, he also could have reasonably determined there was no advantage to requiring the prosecutor to put on evidence before the jury of his prior adjudication for robbery to establish that he had been adjudged a ward of the juvenile court for purposes of count two. Counsel could have

15

reasonably decided that the better course was not to highlight defendant's prior robbery conviction for the jury. We also note that after the court explained the element and his right to have the jury decide the issue beyond a reasonable doubt, defendant expressly waived a jury trial on that element.

We likewise reject defendant's contention that by stipulating to his status as a ward of the court, counsel essentially guaranteed defendant's guilt on count two. To prove this offense, the prosecutor had to show that defendant possessed a firearm, that he knew he possessed a firearm, that he had previously been adjudged a ward of the juvenile court for violating section 211, and that defendant was under 30 years old at the time he possessed the firearm. (§ 29820; CALCRIM No. 2511.) Stipulating to the wardship element did not establish the other necessary elements of the offense. (*People v. Newman* (1999) 21 Cal.4th 413 [*Boykin-Tahl* requirements did not apply to the defendant's stipulation to his status as a felon during his trial on the charge of being a felon in possession of a firearm because no penal consequences flowed directly from the stipulation, and the prosecutor was still required to prove the remaining elements of the felon in possession of a firearm offense], disapproved on another point in *People v. Cross* (2015) 61 Cal.4th 164, 179.)[7]

Counsel was not ineffective for stipulating to the wardship element for count two.

## B.     *Mitigation Evidence at Sentencing*

Defendant contends his counsel was ineffective because he failed to investigate or present information regarding mental health disorders that may have mitigated punishment. On this record, defendant has failed to establish prejudice. (*In re Fields* (1990) 51 Cal.3d 1063, 1079 [appellate court may examine prejudice suffered by defendant as a result of alleged deficiencies before determining whether counsel's

---

[7]     *Boykin v. Alabama* (1969) 395 U.S. 238; *In re Tahl* (1969) 1 Cal.3d 122.

16

performance was deficient]; *Strickland v. Washington, supra,* 466 U.S. at p. 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."].)

As defendant notes, his wife submitted a detailed letter documenting defendant's difficult childhood and various mental health issues. She informed the court that defendant had been diagnosed as a toddler with ADHD and with other mental health issues as an adolescent. According to her, these mental health issues were not treated properly with medication. While serving a term in the Division of Juvenile Justice for robbery, defendant received multiple diagnoses, including ADHD, depression, and posttraumatic stress disorder, and received some medical treatment. Testing demonstrated a low cognitive functioning in defendant's frontal lobes, which caused poor decision making and inhibited impulse control. According to her, defendant's multiple diagnoses paired with his drug abuse affected his mental state and mitigated the circumstances of the present offenses. She requested the court impose the minimum sentence and strike the firearm enhancement.

This letter detailed defendant's various mental health issues for the court's consideration, and expressly asked that the court consider such evidence as a mitigating factor warranting the low term. The court considered the letter and did not find the mental health evidence sufficient to warrant imposing a reduced term. Defendant has not provided any information on what additional mental health evidence he would present to the trial court. On this record, defendant has failed to carry his burden to show prejudice.

### III

#### *Legislative Changes*

While this appeal was pending, the Governor signed Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441, § 1). Effective January 1, 2022, Assembly Bill No. 518 amended section 654 to authorize trial courts to punish an "act or omission that is punishable in different ways by different provisions of law . . . under either of such

provisions." Before the enactment of Assembly Bill No. 518, and when the trial court sentenced defendant, section 654 required the court to punish an act that was punishable in different ways by different laws only "under the provision that provides for the longest potential term of imprisonment." (Former § 654, subd. (a); Stats. 1997, ch. 410, § 1.)

Under *In re Estrada* (1965) 63 Cal.2d 740, "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.) This presumption has been extended to amendments providing trial courts discretion to impose lesser punishment at sentencing and amendments reducing the possible punishment for classes of persons. (See e.g., *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303-304 [Prop. 57, the Public Safety and Rehabilitation Act of 2016 (enacted Nov. 8, 2016)]; *People v. Garcia* (2018) 28 Cal.App.5th 961, 971-972 [Sen. Bill No. 1393 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1013, §§ 1-2)]; *People v. Valenzuela* (2018) 23 Cal.App.5th 82, 87-88 [Sen. Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, §§ 1-2)].) Nothing in Assembly Bill No. 518 suggests legislative intent that the amendments apply prospectively only, and defendant's case is not yet final. (*People v. Sek* (2022) 74 Cal.App.5th 657, 673-674 [Assem. Bill No. 518 applies retroactively to nonfinal judgments].) Because the trial court stayed the lesser sentence on defendant's unlawful firearm possession offense under section 654, and imposed the greater sentence on the involuntary manslaughter conviction, we shall remand the matter for resentencing to allow the trial court the opportunity to exercise its newly granted discretion under amended section 654.

The Governor also signed Assembly Bill No. 124 (2021-2022 Reg. Sess.) and Senate Bills Nos. 81 and 567 (2021-2022 Reg. Sess.), all of which also are effective January 1, 2022. Assembly Bill No. 124 and Senate Bill No. 567 make changes affecting trial court sentencing discretion, including the ability to impose the upper term for a

conviction. (Stats. 2021, ch. 695, § 5.3 [Assem. Bill No. 124]; Stats. 2021, ch. 731, § 1.3 [Sen. Bill No. 567].) Among other things, Assembly Bill No. 124 set a presumption that the trial court will impose the lower term under enumerated circumstances. (Stats. 2021, ch. 695, § 5.3.) Senate Bill No. 567, which was enacted after Assembly Bill No. 124 and incorporated the amendments to section 1170 that were proposed by Assembly Bill No. 124, limits the trial court's ability to impose the upper term, unless certain circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt at trial.[8] (Stats. 2021, ch. 731, § 1.3.) Senate Bill No. 81 amends section 1385 to require a court to dismiss an enhancement if it is in the furtherance of justice to do so, unless dismissal of the enhancement is prohibited by any initiative statute, and requires consideration of certain enumerated factors when exercising this discretion. (Stats 2021, ch. 721, § 1.)

In his supplemental brief, defendant argues this matter must be remanded for resentencing so the trial court may reconsider its sentencing decisions under the rubric of these bills. The People agree that Assembly Bill No. 124 and Senate Bill No. 567 apply retroactively to defendant's case, but they argue remand is unnecessary because the trial court considered defendant's youth at sentencing, properly relied on his criminal history in choosing the upper term, and that a jury would have found the aggravating factors cited by the trial court true beyond a reasonable doubt.[9] Because we are remanding for resentencing under Assembly Bill No. 518, we need not address the parties' arguments.

---

[8] Because Senate Bill No. 567 was enacted after Assembly Bill No. 124, Senate Bill No. 567 takes precedence over Assembly Bill No. 124. (*In re Thierry S.* (1977) 19 Cal.3d 727, 738 ["the bill signed last is the one which takes precedence"].)

[9] The parties disagree on whether Senate Bill No. 81 applies retroactively to defendant's case. Given our conclusion that Assembly Bill No. 518 requires remand, we need not resolve the parties' dispute.

At resentencing, defendant may urge the court to apply ameliorative legislation signed into law during the pendency of this appeal.

## IV

### *Presentence Report Fee*

When defendant was originally sentenced, the trial court imposed a $702 investigation and presentence report fee pursuant to former section 1203.1b. This fee is no longer valid given the Legislature's passage of Assembly Bill No. 1869 (2019-2020 Reg. Sess.) while defendant's appeal was pending. Among other things, Assembly Bill No. 1869, operative July 1, 2021, repealed former section 1203.1b (Stats. 2020, ch. 92, § 47), and also enacted section 1465.9, which states in relevant part: "The balance of any court-imposed costs pursuant to Section . . . 1203.1b . . . , as [that] section[] read on June 30, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (§ 1465.9, subd. (a).) Accordingly, we shall vacate the $702 investigation and presentence report fee.

## DISPOSITION

Defendant's convictions are affirmed, and the $702 investigation and presentence report fee is vacated. The matter is remanded for resentencing in light of Assembly Bill No. 518. At resentencing, defendant may urge the trial court to apply ameliorative legislation signed into law during the pendency of this appeal, including but not limited to Senate Bills Nos. 567 and 81. Following resentencing, the clerk shall prepare an

amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

                                                /s/
                                                HOCH, J.

We concur:

/s/
RAYE, P. J.

/s/
BLEASE, J.